[No. A034048. First Dist., Div. Two. Dec. 16, 1987.*]

ELEANOR RIESE et al., Plaintiffs and Appellants, v.
ST. MARY'S HOSPITAL AND MEDICAL CENTER, Defendant
and Respondent.

*Review granted March 3, 1988. Review dismissed and opinion ordered published June 22, 1989.

**COUNSEL**

Colette I. Hughes and Morton P. Cohen for Plaintiffs and Appellants.

Peter W. Davis, James M. Wood, Ezra Hendon and Crosby, Heafey, Roach & May for Defendant and Respondent.

J. Benedict Centifanti, James J. Preis, Michael L. Perlin and Peter Margulies as Amici Curiae.

**OPINION**

**KLINE, P. J.**—This class action presents the question whether psychiatric patients involuntarily committed to mental health facilities under Welfare and Institutions Code sections 5150 and 5250[1] may be forced to take antipsychotic drugs against their will in nonemergency[2] situations.

Appellant Eleanor Riese, on behalf of the class of patients institutionalized under sections 5150 and 5250 and given antipsychotic drugs over their objection, brought a petition for writ of mandate seeking a determination that the patients' informed consent was required before such drugs could be administered. Appellants contend that California statutes, common law and constitutional guarantees of privacy and freedom of speech give them the right to refuse antipsychotic drugs.

■ We hold that appellants have statutory rights to exercise informed consent to the use of antipsychotic drugs in nonemergency situations absent a judicial determination of their incapacity to make treatment decisions, and do not reach the constitutional issues.

### STATEMENT OF FACTS

Appellant Riese has a history of chronic schizophrenia, apparently stemming from childhood meningitis. She was first hospitalized in 1968, at age 25. In 1969, an internist prescribed the antipsychotic drug Mellaril; appellant showed immediate improvement, moved into her own apartment and was not hospitalized for approximately 11 years. By 1981, however, appellant had developed bladder problems associated with long-term use of Mellaril. Her medication was changed but she decompensated to the point that she had to be hospitalized for two weeks in 1981. She was rehospitalized in 1982 and placed back on Mellaril on the theory that her bladder was already so damaged that more or less Mellaril would not affect its potential recovery. In 1984, appellant switched doctors and was placed on Moban, which did not help her symptoms. She then stopped seeing the doctor,

---

[1] All statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] "An emergency exists when there is a sudden marked changed in the patient's condition so that action is immediately necessary for the preservation of the life or the prevention of serious bodily harm to the patient or others, and it is impracticable to first obtain consent." (Cal. Admin. Code, tit. 9, § 853.)

decompensated and was hospitalized, the hospitalization from which the present litigation arose.

Appellant was admitted to respondent hospital as a voluntary patient on June 12, 1985, for an acute exacerbation of chronic schizophrenia. According to the report of the initial consultation, she had previously been treated with Mellaril but had not been taking the drug for five weeks. According to two psychiatrists who reviewed her records, appellant's failure to continue this medication was not the cause of the increasing agitation and anxiety, hallucinations and paranoid ideation that led to her hospitalization.

Upon admission, appellant signed a voluntary inpatient's consent form for antipsychotic medication, indicating that she had been informed of the nature of the drugs and their possible side effects and understood her right to refuse the drugs. The form specified the drugs Mellaril and Cogentin. On June 16, appellant consented to have her medication changed to Molindane (Moban). On June 17, the medication was changed to Navane, this time without execution of a consent form. On June 18, appellant was switched back to Mellaril, at an increased dosage. Appellant complained that Mellaril made her sleepy but agreed to take 100 milligrams 4 times a day. The next day she complained of dizziness and dry mouth and insisted that the staff had given her too much medication. When appellant became more agitated and refused medication she was forcibly injected.[3]

At this point, on June 19, appellant was made an involuntary patient under Welfare and Institutions Code section 5250, on the ground that she refused medication and became violent, was unable to cooperate with treatment and was actively psychotic. Thereafter, appellant was apparently switched back to Navane and given medication intramuscularly when she refused to ingest it orally. Appellant complained that Navane had adverse physical effects (dermatitis and swelling of the ankles) and at one point agreed to take Mellaril in order to discontinue the Navane.

On June 26, 1985, it was recommended that a conservator be appointed for appellant, who was assertedly unable to provide for her own food, shelter and clothing and delusional about medication and therefore unable or unwilling to accept voluntary treatment. (§ 5352.) A temporary conservator was appointed on July 2 (§ 5352.1); a conservator was appointed subsequently on August 5, 1985. (§ 5350.) The court authorized the tempo-

---

[3] According to appellant's hospital records, she "cooperated [with the] injections although needed a show of force (5 staff members)." Appellant's declaration states that she was held down by several men who took down her underwear and injected her in the buttocks.

rary conservator to place appellant for psychiatric treatment. (§§ 5353, 5358.)

On July 10, appellant was discharged to a board and care home, but she did not do well and was readmitted to the hospital on July 12. Her medication was changed to Serentil, with orders providing for intramuscular injections if she refused. Appellant continued to suffer from swollen feet, urinary problems, shaking, memory loss and seizures. While appellant attributes these problems to her use of medications, respondent contends that appellant was delusional about the medications.

DISCUSSION

*Antipsychotic Medications*

Antipsychotic or, as they are sometimes called, psychotropic or neuroleptic drugs are "customarily used for the treatment of symptoms of psychoses and other severe mental and emotional disorders." (Cal. Admin. Code, tit. 9, § 856.) The drugs benefit many patients by minimizing or eliminating psychotic symptoms (*Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 531 [223 Cal.Rptr. 746] review den. July 10, 1986; Gelman, *Mental Hospital Drugs, Professionalism, and the Constitution* (1984) 72 Geo.L.J. 1725, 1741), although not all patients are helped by the drugs and some improve without them (Hollister, Psychiatric Disorders (1980) Principles and Practice of Clinical Pharmacology and Therapeutics, p. 1076; Jennings & Schultz, *Psychopharmacologic Treatment of Schizophrenia: Developing a Dosing Strategy* (1986) 21 Hosp.Formul. 332), and there is no means to accurately predict how a patient will react to a particular drug. (Kemna, *Current Status of Institutionalized Mental Health Patients' Right to Refuse Psychotropic Drugs* (1985) 6 J. Legal Med. 107; Plotkin, *Limiting the Therapeutic Orgy : Mental Patients' Right to Refuse Treatment* (1977) 72 Nw.U.L.Rev. 461, 474-475.) The drugs are palliative rather than curative (Baldessarini, Chemotherapy in Psychiatry: Principles and Practice (rev. ed. 1985) 52; Hollister, *supra,* at p. 1076) and are most effective in the treatment of acute (short-term) rather than chronic (long-term) psychosis. (Baldessarini, *supra,* at pp. 52-53, 57; 87-88; Baldessarini & Lipinski, *Risks vs. Benefits of Antipsychotic Drugs* (1973) 289 New Eng. J. of Med., 427, 427-428; Kemna, *supra,* 6 J. Legal Med. at p. 110.) For acute cases, however, these drugs are the principal and single most effective treatment (Baldessarini & Lipinski, *supra,* at p. 427; Baldessarini, *supra,* at p. 87; Hollister, *supra,* at p. 1076), and "withholding of these medications within a period of weeks to a few months after recovery from an acute breakdown carries a serious risk of relapse." (Baldessarini & Lipinski, *supra,* at pp. 427-428.) Indeed, use of these drugs has greatly reduced the number of mentally ill

requiring hospitalization, and the frequency and length of hospitalizations. (Hollister, *supra,* at p. 1058; Gelman, *supra,* at pp. 1725-1726, 1741; Brooks, *Law and Antipsychotic Medications* (1986) 4 Behavioral Sciences & The Law 247, 248-249.) It is believed that the positive effects of antipsychotic drugs are greatly lessened if the patient does not accept them willingly. (*Rennie* v. *Klein* (D.N.J. 1978) 462 F.Supp. 1131, 1141.)

Antipsychotic drugs have been described as normative in the sense that they "restore existing imbalance toward the balanced norm . . . [and] are generally incapable of creating thoughts, views[,] ideas or opinions *de novo,* or of permanently inhibiting the process of thought generation." (Appelbaum & Gutheil, *"Rotting with their Rights On": Constitutional Theory and Clinical Reality in Drug Refusal by Psychiatric Patients* (1979) 7 Am.Acad.Psychiatry & L.Bull. 306, 308.) By the same token, they are by intention mind altering in that they act upon thought processes. (*Guardianship of Roe* (1981) 383 Mass. 415 [421 N.E.2d 40, 52-53]; *Rogers* v. *Okin* (D.Mass. 1979) 478 F.Supp. 1342, 1360 affd. in part, reversed in part (1st Cir. 1980) 634 F.2d 650, vacated *Mills* v. *Rogers* (1982) 457 U.S. 291 [73 L.Ed.2d 16, 102 S.Ct. 2442] on remand (1st Cir. 1984) 738 F.2d 1.) The drugs have been called "powerful enough to immobilize mind and body." (*Guardianship of Roe, supra,* 421 N.E.2d at p. 53.) They " 'possess a remarkable potential for undermining individual will and self-direction, thereby producing a psychological state of unusual receptiveness to the directions of custodians.' " (*Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 531, quoting Gelman, *supra,* at p. 1751.) Abuses of psychotropic medications in understaffed and inadequately funded public mental hospitals have been documented. (See, e.g., *Davis* v. *Hubbard* (N.D.Ohio 1980) 506 F.Supp. 915, 926-927.)

In addition to their universally accepted benefits in the treatment of at least acute patients, antipsychotic drugs have equally well-recognized adverse side effects. These include sedation to the extent of interference with the ability to function normally; akathesia, an irresistible urge to move; pseudo-Parkinsonism (causing mask-like facial expression, body rigidity, tremor, drooling, and a shuffling gait); blurred vision; dry mouth; dizziness or faintness; and low blood pressure. These effects are reversible upon termination or reduced dosage of the medication. On rare occasions, the drugs may cause sudden death. (*Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 531; *Davis* v. *Hubbard, supra,* 506 F.Supp. 915, 928; Kemna, *supra,* 6 J. Legal Med. at pp. 111-114.)

A potentially permanent side effect of antipsychotic medication is tardive dyskinesia, a neurological disorder manifested by involuntary, rhythmic and grotesque movements of the face, mouth, tongue, jaw and extremities.

In its most progressive state, this condition interferes with all motor activity. (*Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 531; *Davis* v. *Hubbard, supra,* 506 F.Supp. at pp. 928-929; Kemna, *supra,* 6 J. Legal Med. at p. 113; see also, Taub, *Tardive Dyskinesia: Medical Facts and Legal Fictions* (1986) 30 St.Louis U.L.J. 833.) As tardive dyskinesia generally occurs after prolonged use of antipsychotic drugs (*Rogers* v. *Okin, supra,* 478 F.Supp. at p. 1360; Baldessarini, *supra,* at p. 75; Mills, Norquist, et al., *Consent and Liability with Neuroleptics: The Problem of Tardive Dyskinesia* (1986) 8 Intl.J.L. & Psychiatry 243, 246; Mann, et al., *Early Onset of Severe Dyskinesia Following Lithium-Haloperidol Treatment* (1983) 140 Am.J.Psychiatry 1385), respondent contends that it poses no risk to appellants, who are confined only on a short-term basis. It appears, however, both that the condition can occasionally occur after only brief treatment (Appleton, *Fourth Psychoactive Drug Usage Guide* (1982) 43 J.Clin.Psychiatry 12; Mann, et al., *supra,* 140 Am.J.Psychiatry at pp. 1385-1386), and that it may result from cumulative treatment (Kane, et al., *Integrating Incidence and Prevalence of Tardive Dyskinesia* (1986) 22 Psychopharmacology Bull. 254, 255), so that a patient subject to repeated hospitalizations might suffer incremental effects from short term drug treatment.

## The Right to Refuse Antipsychotic Medication

The rights of involuntarily detained mentally disordered people in California are scrupulously protected by the Lanterman-Petris-Short Act. (§ 5000 et seq., hereinafter LPS; *Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 534.) ■ The act repealed the previously existing indeterminate civil commitment scheme; removed legal disabilities previously imposed upon those adjudicated to be mentally ill; and emphasized voluntary treatment, with periods of involuntary observation and crisis treatment for people unable to care for themselves or whose condition makes them a danger to themselves or others. (*Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 668 [83 Cal.Rptr. 600, 464 P.2d 56]; see § 5001.)

Under LPS, a person may be involuntarily detained in a mental health facility for 72 hours if a peace officer or one of certain specified professionals finds probable cause that the person is a danger to self or others or is "gravely disabled," that is, if he or she, as a result of a mental disorder, is unable to provide for basic personal needs for food, clothing or shelter. (§§ 5008, subd. (h)(1), 5150.)[4] The person may be certified for 14 days of inten-

---

[4] A person is also gravely disabled if he or she has been found mentally incompetent under section 1370 of the Penal Code, the indictment or information charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person, and has not been dismissed, and the person "as a result of mental disorder . . . is unable to un-

sive treatment if the professional staff of the facility determines that any of these conditions exist. (§ 5250.)[5] At this point, a conservator may be appointed if the person is judicially determined to be gravely disabled as a result of mental disorder or impairment by chronic alcoholism. (§ 5350.) ■ Appointment of a conservator under LPS, as under the Probate Code, does not involve an adjudication of incompetence (*Board of Regents* v. *Davis* (1975) 14 Cal.3d 33, 38-39, 43 [120 Cal.Rptr. 407, 533 P.2d 1047] on remand (1977) 74 Cal.App.3d 862 [141 Cal.Rptr. 670]; *Baber* v. *Napa State Hospital* (1984) 154 Cal.App.3d 514, 519 [201 Cal.Rptr. 432]; 58 Ops.Cal.Atty.Gen. 849 (1975)) or incapacity to make treatment decisions about one's own body. (60 Ops.Cal.Atty.Gen. 375, 376-378 (1977); 58 Ops.Cal.Atty.Gen. 849 (1977).) The conservatee retains the right to refuse medical treatment unless the court, after making appropriate findings, specifically denies the conservatee this right in its order and authorizes the conservator to make informed consent decisions. (*Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at pp. 535-536.)

A number of provisions of LPS delineate rights held by involuntary patients. Section 5325 requires that enumerated rights be prominently posted or otherwise brought to patients' attention; the most significant for purposes of this case are the right "[t]o refuse convulsive treatment" (such as electroconvulsive and insulin coma treatment) (§ 5325, subd. (f)) and "[t]o refuse psychosurgery." (§ 5325, subd. (g).)[6] Section 5325.1 generally

derstand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of his defense in a rational manner." (§ 5008 subd. (h)(2)(iii).)

[5] A person may be confined for an additional 14 days of intensive treatment if the person is suicidal (§ 5260), and for 180-day postcertification treatment periods if the person presents "a demonstrated danger of inflicting substantial physical harm upon others." (§§ 5300-5306.)

[6] The full text of section 5325 is as follows: "Each person involuntarily detained for evaluation or treatment under provisions of this part, each person admitted as a voluntary patient for psychiatric evaluation or treatment to any health facility, as defined in Section 1250 of the Health and Safety Code, in which psychiatric evaluation or treatment is offered, and each mentally retarded person committed to a state hospital pursuant to Article 5 (commencing with Section 6500) of Chapter 2 of Part 2 of Division 6 shall have the following rights, a list of which shall be prominently posted in the predominant languages of the community and explained in a language or modality accessible to the patient in all facilities providing such services and otherwise brought to his or her attention by such additional means as the Director of Mental Health may designate by regulation: [¶] (a) To wear his or her own clothes; to keep and use his or her own personal possessions including his or her toilet articles; and to keep and be allowed to spend a reasonable sum of his or her own money for canteen expenses and small purchases. [¶] (b) To have access to individual storage space for his or her private use. [¶] (c) To see visitors each day. [¶] (d) To have reasonable access to telephones, both to make and receive confidential calls or to have such calls made for them. [¶] (e) To have ready access to letterwriting materials, including stamps, and to mail and receive unopened correspondence. [¶] (f) To refuse convulsive treatment including, but not limited to, any electroconvulsive treatment, any treatment of the mental condition which depends on the induction of a convulsion by any means, and insulin coma treatment. [¶] (g) To refuse psychosurgery. Psychosurgery is defined as those operations currently referred to as lobotomy, psychiatric

states that "[p]ersons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California unless specifically limited by federal or state law or regulations" and then sets out a nonexclusive list of rights including "[a] right to dignity, privacy, and humane care" (§ 5325.1, subd. (b)) and "[a] right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect. Medication shall not be used as punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program." (§ 5325.1, subd. (c); see, §§ 5005, 5327.)[7] Involuntary patients who are receiving medications as a result of their mental illness must be given, as soon as possible after detention, written and oral information about the probable effects and possible side effects of the

surgery, and behavioral surgery and all other forms of brain surgery if the surgery is performed for the purpose of any of the followin g: [¶] (1) Modification or control of thoughts, feelings, actions, or behavior rather than the treatment of a known and diagnosed physical disease of the brain. [¶] (2) Modification of normal brain function or normal brain tissue in order to control thoughts, feelings, actions, or behavior. [¶] (3) Treatment of abnormal brain function or abnormal brain tissue in order to modify thoughts, feelings, actions or behavior when the abnormality is not an established cause for those thoughts, feelings, actions, or behavior. [¶] Psychosurgery does not include prefrontal sonic treatment wherein there is no destruction of brain tissue. The Director of Mental Health shall promulgate appropriate regulations to assure adequate protection of patients' rights in such treatment. [¶] (h) To see and receive the services of a patient advocate who has no direct or indirect clinical or administrative responsibility for the person receiving mental health services. [¶] (i) Other rights, as specified by regulation. [¶] Each patient shall also be given notification in a language or modality accessible to the patient of other constitutional and statutory rights which are found by the State Department of Mental Health to be frequently misunderstood, ignored, or denied. [¶] Upon admission to a facility each patient shall immediately be given a copy of a State Department of Mental Health prepared patients' rights handbook. [¶] The State Department of Mental Health shall prepare and provide the forms specified in this section and in Section 5157. [¶] The rights specified in this section may not be waived by the person's parent, guardian, or conservator."

[7] Thus, for example, section 5325.1 provides in part as follows: "No otherwise qualified person by reason of having been involuntarily detained for evaluation or treatment under provisions of this part or having been admitted as a voluntary patient to any health facility, as defined in Section 1250 of the Health and Safety Code, in which psychiatric evaluation or treatment is offered shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity, which receives public funds. [¶] It is the intent of the legislature that persons with mental illness shall have rights including, but not limited to, the following: [¶] (a) A right to treatment services which promote the potential of the person to function independently. Treatment should be provided in ways that are least restrictive of the personal liberty of the individual. [¶] (b) A right to dignity, privacy, and humane care. [¶] (c) A right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect. Medication shall not be used as punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program. [¶] (d) A right to prompt medical care and treatment. [¶] (e) A right to religious freedom and practice. [¶] (f) A right to participate in appropriate programs of publicly supported education. [¶] (g) A right to social interaction and participation in community activities. [¶] (h) A right to physical exercise and recreational opportunities. [¶] (i) A right to be free from hazardous procedures."

medication, and must be told the reason the medication is being given or recommended, the likelihood of improving or not improving without the medications, reasonable alternative treatments available, and information concerning the name, dosage and frequency of medication. (§ 5152, subd. (c).)

■ It is one of the cardinal principles of LPS that mental patients may not be presumed incompetent solely because of their hospitalization. As stated in section 5331, "No person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . regardless of whether such evaluation or treatment was voluntarily or involuntarily received."[8] Similarly, section 5326.5, subdivision (d), which is part of a section defining the written consent required in certain circumstances, reiterates the basic idea that: "[a] person confined shall not be deemed incapable of refusal [of proposed therapy] solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person."[9] Provisions such as section 5331 and subdivision (d) of section 5326.5 refer to a legal standard of competence and are in accord with other states' laws. (E.g., *Rivers* v. *Katz* (1986) 67 N.Y.2d 485 [504 N.Y.S.2d 74, 495 N.E.2d 337, 342]; *Goedecke* v. *State, Dept. of Institutions* (1979) 198 Colo. 407 [603 P.2d 123, 125]; *In re K.K.B.* (Okla. 1980) 609 P.2d 747, 749; *Rogers* v. *Com'r of Dept. of Mental Health* (1983) 390 Mass. 489 [458

---

[8] Respondent argues that because section 5331 uses the past tense it "applies only to disabilities that arise after the patient's treatment has been completed and after he or she has been discharged." Therefore, respondent urges, the section implies a legislative intent to limit the rights of hospitalized patients. We reject this contorted construction. First of all, the legislative history of LPS makes it clear the Legislature intended to prohibit a presumption of incompetence both during and after hospitalization. (See, e.g., The Dilemma of Mental Commitments in California: A Background Document, Subcommittee on Mental Health Services, Assembly Interim Committee on Ways and Means (Nov. 1966), pp. 52-53; THE MENTAL HEALTH ACT of 1967, Assembly Bill 1220, Summary of an Act to solve the dilemma of mental commitments in California (April 1967) p. 12). When in 1981 section 5325 was amended to expand the rights of persons involuntarily detained under LPS, the Legislature reiterated its concern that "far too frequently, recipients of mental health services are deprived of the protection of the law and their rights are disregarded or abused both *in the course of obtaining treatment for their disability* and the conduct of their lives in the community." (Stats. 1981, ch. 841, § 1, italics added.) The theory that section 5331 does not apply during hospitalization is also untenable because it rests upon an impermissible inference. As we later explain, persons with mental illness may not be denied rights available to others except on the basis of a specific statutory limitation. (See discussion, *post,* at pp. 1318-1319.) Section 5331 is bereft of any such limitation. Thus, respondent would have us employ a statute designed to expand rights to accomplish the opposite.

[9] An earlier version of section 5326.5 was declared unconstitutional in *Aden* v. *Younger* (1976) 57 Cal.App.3d 662, 686 [129 Cal.Rptr. 535], because it contained a penalty provision dependent on sections 5326.3 and 5326.4, which were found constitutionally infirm for a variety of reasons. (*Ibid.*) In 1976, shortly after *Aden* v. *Younger* issued, the Governor approved legislation amending section 5326.5 by deleting the penalty provision and adding, inter alia, the language now contained in subdivision (d), quoted in the text above.

N.E.2d 308, 314]; *Kemna, supra,* 6 J.Legal Med. at p. 117, fn. 75; *Plotkin, supra,* 72 Nw.U.L.Rev. at pp. 489, 490.)

■ Respondent's claim that LPS affords appellants no right to refuse antipsychotic drugs emphasizes that such right is not listed in section 5325 along with the rights to refuse convulsive treatment and psychosurgery. Respondent additionally points out that the protection against *abuses* in prescribing and dispensing medication afforded by section 5325.1 implies that patients have no right to refuse medication given for proper reasons. Respondent also asserts that section 5152, subdivision (c), which requires that involuntary patients be given information concerning medication they receive without providing that they may refuse such medication, would be superfluous if a right to informed consent existed and would have said so if it was intended to create such a right.

As indicated, the cornerstone of respondent's case is the fact that LPS does not explicitly grant appellants the right they claim. For example, after stressing that "[t]he right to refuse antipsychotic medications absent a finding of incompetency is pointedly not included among the statutory rights given persons involuntarily committed under LPS," respondent argues that those provisions of LPS which confer *other* rights on such persons, such as the right to refuse "convulsive treatment" and "pyschosurgery" (§ 5325, subds. (f) and (g)), "represent a classic illustration of the maxim of *'expressio unius est exclusio elterius* [*sic*],' under which in a comprehensive statutory scheme such as LPS 'there is an inference that all omissions should be understood as exclusions.'" (Citing 2A Sutherland, Statutory Construction (4th ed.), § 47.23, p. 194.)

■ The maxim upon which respondent relies "'requires great caution in its application, and in all cases is applicable only under certain conditions.'" (2A Sutherland, Statutory Construction, *supra,* § 47.25, p. 209.) Moreover, the rule "can be overcome by a strong indication of legislative intent or policy." (*Id.,* § 47.23. p. 194.) As stated by our Supreme Court, "the inference embodied in the maxim *inclusio unius est exclusio alterius* is not to be drawn when to do so would frustrate a contrary expression of legislative will . . . ." (*Fields* v. *Eu* (1976) 18 Cal.3d 322, 332 [134 Cal.Rptr. 367, 556 P.2d 729]; accord, *Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 658 [135 Cal.Rptr. 75, 557 P.2d 507].)

■ In this case, the treatment of a statutory omission as an exclusion would clearly frustrate a contrary expression of legislative purpose: throughout the statutory scheme the Legislature repeatedly admonishes

that the failure of LPS to explicitly confer a particular right upon mentally ill persons cannot provide a basis upon which to deny it.

Section 5005 provides that *"Unless specifically stated,* a person [detained under] the provisions of this part shall not forfeit any legal right or suffer legal disability by reason of the provisions of this part." (Italics added.) Similarly, section 5325.1 commences with the definitive statement that "Persons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California *unless specifically limited by federal or state law or regulations."* (Italics added.) Finally, section 5327 specifies that "Every person involuntarily detained under provisions of this part . . . shall be entitled to all rights set forth in this part and *shall retain all rights not specifically denied him under this part."* (Italics added.)

The foregoing provisions were obviously calculated to prohibit the use of legislative silence as a basis upon which to deprive mentally ill persons not adjudicated incompetent of any right enjoyed by others. ■ It should be pointed out, in this connection, that the right of persons not adjudicated incompetent to give or withhold consent to medical treatment is protected by the common law of this state (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242-243 [104 Cal.Rptr. 505, 502 P.2d 1]; *Keyhea* v. *Rushen, supra,* 178 Cal.App.3d 526, 540; *Foy* v. *Greenblott* (1983) 141 Cal.App.3d 1, 11 [190 Cal.Rptr. 84]; *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127, 1137-1138 [225 Cal.Rptr. 297] review den. June 5, 1986; *Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006, 1015 [195 Cal.Rptr. 484, 47 A.L.R.4th 1]) and by the constitutional right to privacy. (*Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 540; *Foy* v. *Greenblott, supra,* 141 Cal.App.3d at p. 11; *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 195 [209 Cal.Rptr. 220] on remand *Bartling* v. *Glendale Adventist Medical Center* (1986) 184 Cal.App.3d 97 [228 Cal.Rptr. 847]; 58 Ops.Cal.Atty.Gen. 849, 850-852 (1975).)[10] This right to control "intrusions of [one's] bodily integrity" (*Bar-*

[10]Although not mentioned by the cited cases, the California Supreme Court's decision in *People* v. *Privitera* (1979) 23 Cal.3d 697 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178], cert. den. *sub nom. Privitera* v. *California* (1979) 444 U.S. 949 [62 L.Ed.2d 318, 100 S.Ct. 419, 420], casts some doubt on whether the right to privacy encompasses decisions to refuse medical treatment. *Privitera* held that the right to privacy does not include decisions about medical treatment, specifically, the "right to obtain drugs of unproven efficacy." (Laetrile.) (*Id.,* at p. 702.) However, that case and others which rely upon its definition of the right of privacy concern state actions which limit access to desired but possibly harmful treatment (*id.,* at pp. 702-703; *Kate' School* v. *Department of Health* (1979) 94 Cal.App.3d 606, 621-622 [156 Cal.Rptr. 529]) or otherwise impinge upon the ability to obtain treatment (*People* v. *Younghanz* (1984) 156 Cal.App.3d 811, 815-816 [202 Cal.Rptr. 97]) or impose regulations on health care providers in the interest of public safety (*Wilson* v. *California Health Facilities Com.* (1980) 110 Cal.App.3d 317, 319, 321-322 [167 Cal.Rptr. 801] app. dism. 450 U.S. 1036 [68 L.Ed.2d 233, 101 S.Ct. 1751].) Such cases are quite different from the present one, where

*tling* v. *Superior Court, supra,* 163 Cal.App.3d at p. 195) extends so far as to protect the choice to refuse life-sustaining treatment. (*Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d at p. 1137; *Bartling* v. *Superior Court, supra,* 163 Cal.App.3d at pp. 193-194; *Barber* v. *Superior Court, supra,* 147 Cal.App.3d at pp. 1015-1016.) ■ Treatment with antipsychotic drugs not only affects the patient's bodily integrity but the patient's mind, the "quintessential zone of human privacy." (*Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 944 [227 Cal.Rptr. 90, 719 P.2d 660]; *Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 842-843 [228 Cal.Rptr. 545].)[11] We have seen that such treatment has profound effects—both intended and unintended—on mind and body. The right to refuse treatment with these drugs clearly falls within the recognized right to refuse medical treatment. (See *Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at p. 540.) Because this right is among those "guaranteed all other persons by the . . . Constitution and laws of the State of California" (§ 5325.1), it cannot be denied those confined under LPS absent a specific statutory limitation.

■ We conclude that the failure of LPS to explicitly grant involuntary patients the right to refuse drug treatment, which respondent relies upon, cannot be deemed as significant as the failure of the statutory scheme to explicitly deny that right. As stated in *Rogers* v. *Com'r of Dept.of Mental Health, supra,* 458 N.E.2d 308, "[t]he fact that [a statute] expressly authorizes patients to refuse psychosurgery and electroconvulsive treatment does not, as the defendants assert, exclude by implication the patients' rights to make treatment decisions as to antipsychotic drugs." (*Id.,* at p. 313.)

Moreover, as earlier explained, LPS is not silent on the question whether involuntary patients may be denied any right on the ground that they are of unsound mind. Section 5331 and section 5326.5, subdivision (d), prohibit the presumption of incompetence from the fact of an involuntary commitment. Other sections also indicate that involuntary commitment is not to be equated with incompetence to participate in treatment decisions. As previously noted, section 5325 gives involuntary patients the right to refuse convulsive treatment and psychosurgery. Psychosurgery may be performed on a patient, voluntary or involuntary, only in specified circumstances and only if the patient gives written informed consent. (§§ 5326.6, 5326.) Similarly, convulsive treatment may be administered to an involuntary patient

---

the state seeks to impose upon an unwilling patient a treatment having potentially harmful effects.

[11] The cited cases protect against intrusions into the mind by means of lie detector tests (*Long Beach City Employees Assn.* v. *City of Long Beach, supra*) or therapists' disclosures (*Cutter* v. *Brownbridge, supra*). While the present case does not involve such forced revelations of the content of the mind, the changing of thoughts contested here is no less intrusive.

under specified circumstances only if the patient gives written informed consent or is judicially determined not to have the capacity to give such consent and the consent is obtained from the patient's responsible relative, guardian or conservator. (§§ 5326.7, 5326.)[12] Thus, LPS recognizes that patients may be involuntarily committed yet nevertheless remain capable of giving informed consent. (See § 5326.15.)[13] Indeed, it is difficult to see the purpose of the recently adopted requirement that involuntary patients, including those detained under an emergency 72-hour commitment (§ 5152, subd. (c)), be given detailed information regarding medications and their side effects if these patients are necessarily incompetent to participate in treatment decisions and have absolutely no right to refuse the treatment prescribed.

The fact that voluntary patients are required to give informed consent to treatment with antipsychotic drugs is also significant. Patients who refuse drugs do so for a variety of reasons; while the majority are apparently delusional or the products of the mental illness, others are more rational. (Appelbaum & Hoge, *Empirical Research on the Effects of Legal Policy on the Right to Refuse Treatment,* in The Right to Refuse Anti-Psychotic Medication (ABA Com. on the Mentally Disabled 1986) 87, 91-92; Kemna, *supra,* 6 J.Legal Med. at pp. 115-116; Appelbaum & Gutheil, *supra,* 7 Am.Acad.Psychiatry & L.Bull. at pp. 311-315; Appelbaum & Gutheil, *Drug Refusal: A Study of Psychiatric Inpatients* (1980) 137 Am.J.Psychiatry 340, 344-345.) In one study, the only patients who refused treatment persistently (more than 24 hours) were judged to be delusional about the medication, suggesting that refusal is more a medical than a legal problem. (Appelbaum & Gutheil, *supra,* 7 Am.Acad.Psychiatry & L.Bull. at p. 313.)[14]

---

[12] Section 5326.15 concerns reporting requirements imposed upon any doctor or facility which administers convulsive treatments or psychosurgery. The section lists as one category "[i]nvoluntary patients who gave informed consent" and as another "[i]nvoluntary patients who were deemed incapable of giving informed consent and received convulsive treatment against their will." (§ 5326.15, subds. (a)(1) and (a)(2).)

[13] A confined person is considered incapable of written informed consent if the person "cannot understand, or knowingly and intelligently act upon" information enumerated in section 5326.2 concerning the reason for the treatment; nature of the procedures to be used; probable degree and duration of improvement or remission expected with or without the treatment; nature, degree, duration and probability of side effects and significant risks of the treatment commonly known to the medical profession, and how and to what extent they may be controlled; reasonable alternative treatments; and the right to refuse or consent to the treatment. (§ 5326.5, subd. (c).)

[14] Research indicates that the epidemic of refusals feared after early litigation of the right to refuse antipsychotic medication (e.g., *Rogers* v. *Okin, supra,* 478 F.Supp. 1342) has not materialized (Appelbaum & Hoge, *supra,* at p. 89) and that refusal has not led to increased accidents or injuries to patients or staff. (Schwartz, *Equal Protection in Medication Decisions: Informed Consent, Not Just the Right to Refuse,* in The Right to Refuse Antipsychotic Medication (ABA Com. on the Mentally Disabled (1986) pp. 74, 77; see also Gill, *Side Effects of a Right to Refuse Treatment Lawsuit: The Boston State Hospital Experience,* in Doudera and

Since "both psychosis and incompetence cut across lines of voluntariness" (*ibid.*), it is not status but competence which should determine a patient's ability to exercise the right to refuse medication.

Additionally, LPS provides that conservatees lose the right to refuse treatment only if a court order specifically gives the right to refuse or consent to treatment to the conservator. (§§ 5357, 5358, subd. (b), 5358.2; *Keyhea* v. *Rushen, supra,* 178 Cal.App.3d at pp. 535-536.) It would be anomalous to presume that patients who are not under conservatorship are less capable of making decisions about their treatment than those who are.

Reasonable minds can perhaps differ on the question whether involuntarily committed mental patients should be presumed incompetent to make treatment decisions. However, such a presumption was demonstrably thought unwise and prohibited by those who enacted LPS. Accordingly, we hold that, absent a judicial determination of incompetence, antipsychotic drugs cannot be administered to involuntarily committed mental patients in nonemergency situations without their informed consent.

*The Role of the Court*

Respondent urges that we adopt the federal approach to the problem of antipsychotic drug refusal in which the role of the court is merely to ensure that professional judgment has been exercised in the decision to medicate a patient. (*Johnson* v. *Silvers* (4th Cir. 1984) 742 F.2d 823, 825; *Project Release* v. *Prevost* (2d Cir. 1983) 722 F.2d 960, 979-981; *Rennie* v. *Klein, supra,* 720 F.2d 266, 269-270; *Stensvad* v. *Reivitz* (W.D.Wis. 1985) 601 F.Supp. 128, 131; *R.A.J.* v. *Miller* (N.D.Texas 1984) 590 F.Supp. 1319, 1321; *Sabo* v. *O'Bannon* (E.D.Pa. 1984) 586 F.Supp. 1132, 1140 disapproved on another point in *Blatz* v. *Shelley* (N.D.Ill. 1987) 661 F.Supp. 169, 178, fn. 36; *United States* v. *Leatherman* (D.C. Cir. 1983) 580 F.Supp. 977, 980 app. dism. and case remanded (D.C. Cir. 1984) 729 F.2d 863).[15] Under-

Swazey, Refusing Treatment in Mental Health Institutions—Values in Conflict (1982) at p. 81.) While a substantial percentage of patients (20 to 50 percent) would refuse medication at some point in their hospitalization if permitted, few (1 to 5 percent, or 15 percent in 1 study) refuse consistently. (Appelbaum & Hoge, *supra,* at pp. 88-89; Appelbaum & Gutheil, *supra,* 137 Am.J. Psychiatry at p. 344; *National Center for State Courts' Guidelines for Involuntary Civil Commitment* (1986) 10 Ment. & Phys. Disability L.Rptr. 409, 458, fn. 5) and most accept medication again within 24 hours. (Appelbaum & Gutheil, *supra,* 7 Am.Acad. Psychiatry & L.Bull. at p. 313; Kemna, *supra,* 6 J.Legal Med. at p. 120.)

[15] These cases follow *Youngberg* v. *Romeo* (1982) 457 U.S. 307, 311 [73 L.Ed.2d 28, 34, 102 S.Ct. 2452] on remand *sub nom. Romeo* v. *Youngberg* (3d Cir. 1982) 687 F.2d 33, which held that involuntarily committed psychiatric patients retain a constitutionally protected liberty interest in reasonably safe conditions of confinement, freedom from unreasonable bodily restraint, and such minimally adequate training as reasonably required by these interests. (*Id.,* at pp. 315-319 [73 L.Ed.2d at pp. 36-39].) These interests, however, are sufficiently protected

lying this approach is the view that professionals are in a better position than courts to make treatment decisions and, therefore, that courts should defer to professional judgment rather than specifying which of several professionally acceptable choices should be made. (*Youngberg* v. *Romeo, supra,* 457 U.S. 319, 321-323 [73 L.Ed.2d 28, 39, 40-42].)

California is not bound to follow the federal standard. The United States Supreme Court has stated, in the context of the very issue before us, that state law may provide greater substantive and procedural rights than federal law and, if so, is determinative. (*Mills* v. *Rogers, supra,* 457 U.S. 291, 299-300 [73 L.Ed.2d 16, 22-24].) ▉ LPS represents a considered decision of our Legislature to impose certain constraints upon the control that medical institutions and health care professionals may unilaterally exert over mental patients committed to their care.

The act accepts the proposition that, as stated by the highest court of New York, mental illness "often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . many mentally ill persons retain the capacity to function in a competent manner." (*Rivers* v. *Katz, supra,* 495 N.E.2d at p. 342; *Rogers* v. *Okin, supra,* 478 F.Supp. at p. 1361; *Davis* v. *Hubbard, supra,* 506 F.Supp. 915, 927 ["roughly 85% of the patients (of a state mental hospital) are capable of rationally deciding whether to consent to (use of psychotropic drugs)."]; Brooks, *The Constitutional Right to Refuse Antipsychotic Medications* (1980) 8 Bull. of Am.Acad.Psychiatry & L.Bull. 179, 191.) Consequently, the task for the court is simply to determine whether a patient refusing medication is competent to do so despite his or her mental illness. The determination of this capacity "is uniquely a judicial, not a medical function." (*Rivers* v. *Katz, supra,* 495 N.E.2d at p. 343.) As stated by an eminent psychiatrist, "Competence is not a clinical, medical, or psychiatric concept. It does not derive from our understanding of health, sickness, treatment, or persons as patients. Rather, it relates to the world of law, to society's interest in deciding whether an individual should have certain rights (and obligations) relating to person, property and relationships." (Michels, *Competence to Refuse Treatment,* in Doudera & Swazey, Refusing Treatment in Mental Health Institutions—Values in Conflict, *supra,* at p. 115; accord, Gutheil & Appelbaum, Clinical Handbook of Psychiatry and the Law (1982) at p. 215.) Though judicial determinations of competency to give informed consent to proposed treatment are not easy, they are no more difficult than other types of competency assessments required to be made by trial courts under LPS

if courts assure that professional judgment was in fact exercised. (*Id.,* at pp. 321-323 [73 L.Ed.2d at pp. 40-42].) Although *Youngberg* did not involve use of antipsychotic drugs, the cited cases take it to set the federal constitutional standard applicable to forcible use of "chemical restraints." (*Sabo* v. *O'Bannon, supra,* 586 F.Supp. 1132, 1140.)

(see, e.g., *Conservatorship of Waltz* (1986) 180 Cal.App.3d 722 [227 Cal.Rptr. 436]) and in other connections. (See, e.g., *People v. Burnett* (1987) 188 Cal.App.3d 1314 [234 Cal.Rptr. 67].) The task is facilitated by the increasing ability of mental health professionals to effectively assist in the forensic enterprise. (See, e.g., Gutheil & Bursztajn, *Clinicians' Guidelines for Assessing and Presenting Subtle Forms of Patient Incompetence in Legal Settings* (1986) 143 Am.J.Psychiatry 1020.)

■ Provisions of LPS governing the determination required when a patient's capacity to consent to convulsive therapy is called into question seem to us equally appropriate when the question is capacity to consent to antipsychotic medication. LPS provides that there must be an evidentiary hearing directed to the question whether the patient is able to understand and knowingly and intelligently act upon information required to be given regarding the treatment. (§§ 5326.7, 5326.5; *Conservatorship of Waltz, supra,* 180 Cal.App.3d 722, 729; *Lillian F. v. Superior Court* (1984) 160 Cal.App.3d 314, 320 [206 Cal.Rptr. 603]; *Conservatorship of Fadley* (1984) 159 Cal.App.3d 440, 446 [205 Cal.Rptr. 572].) The determination of incapacity must be made by clear and convincing evidence. (*Conservatorship of Waltz, supra,* at p. 733; *Lillian F. v. Superior Court, supra,* at p. 324.) The court is *not* to decide such medical questions as whether the proposed therapy is definitely needed or is the least drastic alternative available, but may consider such issues only as pertinent to assessment of the patient's ability to consent to the treatment. (*Conservatorship of Waltz, supra,* 180 Cal.App.3d at p. 728; *Conservatorship of Fadley, supra,* 159 Cal.App.3d at p. 446; see § 5326.7.)[16]

■ Judicial determination of the specific competency to consent to drug treatment should focus primarily upon three factors: (a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention (e.g., "an acutely

---

[16]Thus the procedure we specify is different from those required in other jurisdictions that have determined as a matter of state or constitutional law that involuntary patients may not be forced to take antipsychotic drugs in nonemergency situations absent judicial authorization. (*Rogers v. Com'r of Dept. of Mental Health, supra,* 458 N.E.2d at p. 314; *Goedecke v. State Dept. of Institutions, supra,* 603 P.2d at p. 125; *Rivers v. Katz, supra,* 495 N.E.2d at pp. 343-344; *In re K.K.B., supra,* 609 P.2d at pp. 751-752; see also, *Opinion of the Justices* (1983) 123 N.H. 554 [465 A.2d 484, 489-490].) Courts in these states require some form of judicial determination as to treatment once a patient is found incompetent; the court must make either a "substituted judgment" determination, seeking to reach the conclusion the patient would have reached if competent (*Rogers v. Com'r of Dept. of Mental Health, supra,* at pp. 315-318; see also, *In re Boyd* (D.C.App. 1979) 403 A.2d 744, 750-751), or a form of "less intrusive alternative determination." (*Rivers v. Katz, supra,* 495 N.E.2d at p. 344; *People v. Medina* (Colo. 1985) 705 P.2d 961, 973.)

psychotic patient should understand that psychotropic medication carries the risk of dystonic reactions [i.e., abnormal control and coordination of movement] . . . that the benefit is the probable resolution of the psychotic episode; and that alternatives include psychotherapy and milieu therapy, and possibly ECT, but that at least the two former alternatives carry a lower short-term success rate than does medication." (Gutheil & Appelbaum, Clinical Handbook of Psychiatry and the Law, *supra,* at p. 219)); and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes. With respect to this last consideration, it has with reason been urged that "the appropriate test is a negative one: in the absence of a clear link between an individual's delusional or hallucinatory perceptions and his ultimate decision," it should be assumed "that he is utilizing rational modes of thought." (*Id.,* at p. 220.)

■ If an involuntary patient is judicially determined to possess the capacity to give informed consent to the use of antipsychotic drugs and refuses to do so, the patient may not be required to undergo the treatment. If the patient is judicially determined incapable of giving informed consent, and if he or she is being detained for 72-hour treatment and evaluation under section 5150 or for not more than 14 days of intensive treatment under section 5250, the patient may thereupon be required to accept the drug treatment that has been medically prescribed. If confinement of a patient determined incapable of giving informed consent has been authorized for a period longer than 14 days, such consent must be obtained from the "responsible relative or the guardian or the conservator of the patient." (Cf. § 5326.7, subd. (g).) "[A]ny surrogate . . . ought to be guided in his or her decisions first by his knowledge of the patient's own desires and feelings, to the extent that they were expressed before the patient became incompetent. [¶] If it is not possible to ascertain the choice the patient would have made, the surrogate ought to be guided in his decision by the patient's best interests." (*Barber* v. *Superior Court, supra,* 147 Cal.App.3d at p. 1021.)[17]

Although available empirical evidence suggests that judicial intervention will not be required in the overwhelming number of cases in which an antipsychotic drug has been prescribed, because involuntarily committed

---

[17]The LPS provision requiring a surrogate to give informed consent to convulsive treatment when the patient is incompetent to do so (§ 5326.7) makes no exception, as we do, during the 72-hour and 14-day periods of initial confinement authorized by sections 5150 and 5250. The question whether the consent of a surrogate should be required during these brief periods (when it would often be difficult to identify, locate and adequately inform the appropriate surrogate) was not addressed in the statute because, unlike antipsychotic drugs, convulsive treatment is almost never prescribed at this time.

mental patients usually do not object to such treatment (Appelbaum & Hoge, Empirical Research on the Effects of Legal Policy on the Right to Refuse Treatment, *supra,* at p. 89; *Courts' Guidelines for Involuntary Civil Commitment, supra,* 10 Mental & Physical Disability L.Rep. at p. 457; see also fn. 16), we are obliged to acknowledge that the interposition of the courts in the manner we prescribe will likely create some logistical problems and delay. However, neither this prospect, which can be contained by responsive trial courts, nor the likelihood that the courts will in most cases find the patient resisting drug treatment mentally incompetent to do so, warrant judicial retreat from the field, which would be impossible to reconcile with the legislative mandate.

The determination by a physician that an individual is mentally incompetent to refuse drug treatment cannot be exempted from judicial evaluation on the ground that the medical determination rests upon an unimpeachable scientific foundation. "[B]ecause of the imprecision of the criteria and difficulty inherent in any attempt to compass the human mind" (*People* v. *Burnett, supra,* 188 Cal.App.3d 1314, 1329, citing Gould, The Mismeasure of Man (1981)), determinations of mental competence simply cannot achieve scientific certainty. Moreover, the forcible administration of powerful mind-altering drugs also involves moral and ethical considerations not solely within the purview of the medical profession, and must be measured by the social consensus reflected in our laws. Exemption of these decisions from such external evaluation would invest physicians with a degree of power over others that cannot be squared with the intent of our Legislature and with the great value our society places on the autonomy of the individual. Such complete power also would not serve and might even be inimical to the genuine interests of the medical profession.

Unless the incompetence of a person refusing drug treatment has been judicially established, "it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires." (*Rivers* v. *Katz, supra,* 495 N.E.2d at p. 341.) The Legislature has made it eminently clear that this right does not disappear upon involuntary commitment.

The judgment is reversed and the case remanded for proceedings consistent with the views expressed herein.

Rouse, J., and Benson, J., concurred.

**BENSON, J.**—I concur with the decision reached by my colleagues but do so solely on the basis that Welfare and Institutions Code section 5326.5,

subdivision (d) directly and unequivocally addresses the issue raised on this appeal. It states: "A person confined shall not be deemed incapable of refusal [of proposed therapy] solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person." Subdivision (c) of that statute recognizes limitations on the right conferred by declaring that "[a] person confined shall be deemed incapable of written informed consent if such person cannot understand, or knowingly and intelligently act upon, the information specified in Section 5326.2." Thus the competence of the involuntarily confined patient to exercise informed consent must be determined in those nonemergency cases where antipsychotic medication is refused.

In my opinion, my colleagues' discussion of Welfare and Institutions Code sections 5005, 5152, subdivision (c); 5325, subdivision (f); 5325, subdivision (g); 5325.1, subdivisions (b) and (c); 5326, 5326.6, 5326.7, 5326.15, 5327, 5331, 5358, subdivision (b); and 5358.2 is unnecessary to the decision and, though scholarly and interesting, serves to obscure the narrow statutory basis which supports the decision we have reached.

I share my colleagues acknowledgment and concern that "the interposition of the courts . . . will likely create some logistical problems and delay. . . ." While I am naturally concerned about the consequences of our decision on the already overburdened trial courts, my greater concern is directed toward the decision's impact upon the short-term crisis intervention program envisioned by the Lanterman-Petris-Short Act (LPS) and upon the medical professionals who must treat the patient who has been involuntarily confined because he or she is gravely disabled or a danger to self or others. The time a medical professional is required to devote going to, while at, and returning from a judicial hearing, is time lost from patient care. The longer an incompetent patient may lawfully reject antipsychotic medication which, in the judgment of medical professionals, may offer therapeutic benefit, the more tenuous the possibility for effective crisis management. The matter of developing procedures which are the least intrusive to the medical scheme envisioned by LPS should be, in my judgment, a matter of legislative priority.