Filed 8/15/16  Conservatorship of H.W. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| Conservatorship of the Person of H.W. | 2d Civil No. B270258<br>(Super. Ct. No. PR130306)<br>(San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY PUBLIC GUARDIAN, as Conservator, etc.,<br><br>  Petitioner and Respondent,<br><br>v.<br><br>H.W.,<br><br>  Objector and Appellant. | |

Conservatee H.W. appeals orders of the superior court reestablishing a Lanterman-Petris-Short (LPS) Act conservatorship (Welf. & Inst. Code, §§ 5350, 5361 et seq.) and reappointing the San Luis Obispo County Public Guardian (Public Guardian) as H.W.'s conservator.  The trial court found that H.W. is gravely disabled as a result of a mental disorder and that she "lacks capacity to refuse or consent to mental health treatment and medical treatment."  We conclude, among other things, that substantial evidence supports the trial court's orders.  We affirm.

FACTS

On November 14, 2013, the Public Guardian filed a petition to be appointed the LPS conservator for H.W. After a January 15, 2014, court trial, the trial court granted the petition (the first conservatorship). H.W. appealed.

On December 17, 2014, after a court trial, the trial court reappointed the Public Guardian as LPS conservator for H.W (the second conservatorship). H.W. appealed. In *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378, we conditionally reversed the judgment on the second conservatorship because the trial court did not obtain a personal waiver from H.W. of her right to a jury trial.

In March 2016, while the case was on appeal, the parties stipulated to a reversal of the judgment in the first conservatorship for the same reason.

On October 29, 2015, the Public Guardian filed the instant petition seeking "reappointment" as "LPS conservator" for H.W. for the period December 20, 2015, to December 19, 2016 (the current conservatorship). On December 3, 2015, the trial court held a hearing where H.W. personally waived her right to a jury trial on the current conservatorship petition.

At trial the Public Guardian amended the petition to state that a board-and-care facility is the "most appropriate" level of "placement" for her.

The Public Guardian called H.W. as the first witness. H.W. testified she had been at the Seventh Avenue treatment facility for two years. The police sent her there because she had been knocking on someone's door asking for money. She wanted to be "somewhere safer." She said, "So I requested to go to the mental hospital, thinking I could get out when I got my SSI check."

Five years ago H.W. lived in motels in Salinas for three months. Her "visions" prevented her from getting a job or functioning. H.W. takes Risperdal, Ativan, Cogentin and Zyprexa for "mild schizophrenia." She had a recent vision of "blood spurting" from a resident's mouth, but she knew it was "fake." Sometimes she hears things, but "that's what Risperdal is for, and it worked for me." She has a "discharge"

2

plan to "go for a motel room or rent a room from a person's house . . . . I have enough money now. I have SSI of $897 a month."

H.W. did not know how to replace the payee so she could directly receive her SSI check. Her goal is to go to college. She has not discussed her goals with her mental health worker. Her worker recommended a rehabilitation center, but H.W. was not interested because she feels she is "not gravely disabled." "I don't need people watching over me." She was asked if she trusted anyone at the rehabilitation center. She responded, "They don't need to help me. I already know where I want to be."

Rose Drago, a psychiatrist, testified H.W. suffers from a schizoaffective disorder which affects her ability to obtain food, clothing and shelter. The disorder negatively impacts H.W.'s ability to find a room or a motel. When H.W. has been on her own, she is unable to care for herself and becomes "floridly psychotic." She was diagnosed with a bipolar disorder at the age of 15. She has "exhibited auditory hallucinations, disorganized thinking, extreme paranoia, mood instability that has gotten to the point of assaultiveness at times . . . ." Drago said a "board and care would be the most appropriate and least restrictive" level of "placement" for H.W.

John Engers, a psychiatrist at the Seventh Avenue facility, testified he is responsible for "medication management." H.W. has gained some understanding as to the "utility [of] the medications" he prescribes. Since August 2014, she has been taking the medications without objection. H.W. "really doesn't talk to anyone ever." She is "not a behavior problem. . . . From the beginning, it was clear [H.W.] did not need to be in a locked institution. She could easily have gone to a board and care a year and a half ago, but she refuses. . . . I completely agree with Dr. Drago: she should be in a board and care home. That's the normal transition that people who have been locked up make in order to gain their total freedom, but [H.W.] has just been so unwilling to even talk about that . . . . It's been really frustrating for the treatment team because she is a nice, vulnerable lady and we would love to help her, but she won't let anyone help her."

Engers wrote a letter stating H.W. was not gravely disabled. But in doing so, he admitted he was "a bit duplicitous." The letter was not accurate. He only meant

3

that in the treatment facility "she eats, she has shelter and she has clothing." He wrote the letter at H.W.'s request because he was "so pleased that she approached [him] and actually wanted to talk . . . ."

The trial court found H.W. "is markedly better psychiatric-symptom-wise from what I have heard last year," but "petitioner has proved beyond a reasonable doubt that she does remain gravely disabled."

DISCUSSION

*Substantial Evidence*

H.W. contends there is insufficient evidence to support the finding that she is gravely disabled. She claims the trial court erred by granting the petition to reestablish the conservatorship. We disagree.

In reviewing a challenge to the sufficiency of the evidence, we must draw all reasonable inferences in support of the trial court's findings. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400-1401.) We do not decide the credibility of the witnesses or resolve conflicts in the evidence. "If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

The conservator may petition the superior court for "reestablishment of the conservatorship" at the end of the initial LPS conservatorship term. (*Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446.) The conservator must prove the "conservatee remains gravely disabled." (*Ibid.*) Under the LPS Act, "gravely disabled" is defined as "'[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter.'" (*Ibid.*)

H.W. relies on her own evidence. But the issue is not whether some evidence supports her position, it is only whether substantial evidence supports the judgment.

Drago's testimony shows that H.W. has a mental disorder which affects her ability to provide for herself. H.W. suffers from a "schizoaffective disorder." "It's a chronic mental illness characterized by psychotic symptoms which can be hallucinations,

4

delusions, disorganized thinking, and it also has components of mood instability . . . ." Her mental disorder "manifest[s] itself in symptoms that affect her ability to provide for food, clothing or shelter." Even if she "were to remain on medication," her "symptoms of paranoia and her inability to trust others would have an impact on her ability to provide for her basic needs." It would "affect her ability to engage with people" to find "a room in a house" or a motel. H.W. "will likely stop her treatment as soon as she is out of the facility," and her "symptoms will escalate markedly." When she is on her own, she has had "interactions with law enforcement when she has been floridly psychotic and not able to take care of herself."

H.W.'s "insight into" her medical condition "is very limited." She does not cooperate with people who are assisting her with her "basic needs." She claimed medical staff "infected her by giving her a pair of shoes." Drago first interviewed H.W. in 2013. H.W.'s "interaction" with Drago has "always" ranged from "mildly hostile to extremely hostile and very guarded." During her first interview, H.W. struck Drago. Drago did not "press charges" because H.W. "needs to be in treatment."

H.W. contends her own testimony shows that a conservatorship is unnecessary. But her credibility was a matter for the trial court. Moreover, she testified about her "vision" of "blood spurting" from a patient's mouth. Much of her testimony shows her unwillingness to cooperate with treatment staff.

H.W. claims Engers's testimony was more reliable than Drago's. But only the trial court weighs the evidence. Moreover, Engers and Drago agreed about H.W.'s lack of cooperation with treatment staff and the appropriate placement level. Engers said H.W. was not willing "to make the normal transition move to a board and care" facility. Engers's testimony is not in conflict with Drago's on whether H.W. could provide for herself outside the treatment facility. Engers merely said he was unable to testify about what she "would be like outside the institution." He knew she wanted to live in Salinas. But he had "no idea if she could manage in Salinas." Engers acknowledges his letter stating H.W. was not gravely disabled "was a bit duplicitous." He explained that he only meant her basic needs are being met at the treatment facility.

5

*Ability to Make Informed Treatment Decisions*

H.W. contends there is no substantial evidence to support a finding that she lacked the ability to make informed treatment decisions. We disagree.

"Judicial determination of the specific competency to consent to drug treatment should focus primarily upon three factors: (a) whether the patient is aware of his or her situation . . . ; (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought . . . and otherwise participate in the treatment decision by means of rational thought processes." (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1322-1323.)

Drago testified H.W. is not "capable of giving informed consent to treatment related to her mental illness," or for "treatment . . . unrelated to her mental illness." H.W.'s insight about her medical condition is "very limited." She says she will take medication, but "she does not follow through with treatment." She has "a history of refusing or discontinuing to take medications." She does not trust her medical "service providers." She "gets very upset when people try to provide treatment." Drago said, "It's not just mental health treatment; I am talking about just basic health issues that have come up at the facility that she is in, very opposed to receiving treatment from people." She "assaulted a staff person that was providing treatment" for lice. Her mental illness is "characterized by psychotic symptoms." Even with her medications, she still has "symptoms of paranoia." She accused medical staff of giving her an infection.

H.W. claims that Engers had a different opinion. Engers said that she was taking her medications and that "she's been quite good medication-wise in terms of her acceptance and recognition that it does do something for her." But the trial court alone resolves conflicts in the evidence and credibility. Engers also testified H.W. did not cooperate with treatment staff and he admitted he had limited ability to evaluate her. H.W. told him she would go to a behavioral health clinic to get medications. But he said, "I don't know if she really feels that or not." He did not have enough conversations with

6

H.W. "to have a really good sense of whether she truly understands and means what she is now saying."

*The Impact of the Reversal of the Second Conservatorship on This Case*

H.W. contends our reversal of the second conservatorship in *Conservatorship of Heather W.*, *supra*, 245 Cal.App.4th 378, "undermines the validity" of the current conservatorship. We disagree.

"Under the LPS Act, conservatorships automatically terminate after one year." (*Conservatorship of Deidre B.* (2010) 180 Cal.App.4th 1306, 1312.) The second conservatorship has expired. The evidence in that proceeding related to whether H.W. was gravely disabled in that prior period. The issues relating to that expired conservatorship are now moot. (*In re O.P.* (2012) 207 Cal.App.4th 924, 927.) The only relevant issue is whether the current conservatorship judgment is supported by substantial evidence. (*Ibid.*; see also *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 180.)

Each petition for a new LPS term is an independent case. An invalid conservatorship for one time period does not invalidate a conservatorship for a later time period. (*Conservatorship of Manton* (1985) 39 Cal.3d 645, 652, fn. 5.) In *Manton*, the Supreme Court ruled that a prior LPS conservatorship was invalid, but that did not impact the validity of the current conservatorship. The court said, "This determination does not mandate that any existing conservatorship be vacated. Appellant's present status as a conservatee, if applicable, *would, of course, be pursuant to proceedings subsequent to those at issue here.*" (*Ibid.*, italics added.)

Vacating the prior conservatorships does not give the Public Guardian a reduced burden at a reestablishment hearing. "The reestablishment hearing is conducted according to the same rules that govern the initial establishment of a conservatorship." (*Conservatorship of Deidre B.*, *supra*, 180 Cal.App.4th at p. 1312.) The conservator must prove beyond a reasonable doubt that the proposed conservatee is currently gravely disabled. (*Ibid.*)

At a remand hearing on May 27, 2016, the superior court found: 1) H.W. had the capacity to personally waive her right to a jury trial, 2) she was not given the

7

opportunity to do so in the second conservatorship, and 3) the second conservatorship was therefore invalid. The court set a jury trial on the question whether H.W. was gravely disabled *in 2014* to support the appointment of an LPS conservator *for that period*.[1]

Holding jury trials on the expired first or second conservatorship cases at this time would be an exercise in futility. It would waste judicial resources because those cases are moot. H.W. had an opportunity to request a jury trial *on the current case*, but she personally waived one.

We have reviewed H.W.'s remaining contentions and conclude she has not shown grounds for reversal.

DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.

PERREN, J.

---

[1] On June 20, 2016, H.W. filed a petition for writ of mandate in this court, challenging the superior court's order of May 27, 2016, limiting the jury trial to the issue of whether she was gravely disabled in 2014, rather than currently gravely disabled. (*H.W. v. Superior Court*, No. B275644.)

Ginger E. Garrett, Judge

Superior Court County of San Luis Obispo

_____


Jean Matulis, under appointment by the Court of Appeal, for Objector and Appellant.

Rita L. Neal, County Counsel, Susan Hoffman, David M. Stotland, Deputy County Counsel, for Petitioner and Respondent.