Filed 5/16/14  In re Z.R. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Z.R., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STEPHANIE R.,<br><br>        Defendant and Appellant. | A138958<br><br>(Sonoma County<br>Super. Ct. No. 3872-DEP) |

Stephanie R. (appellant) appeals from the juvenile court's order, pursuant to Welfare and Institutions Code section 366.26,[1] terminating her parental rights with respect to her three-year-old son, Z.R.  Appellant contends the juvenile court committed reversible error by failing to appoint a guardian ad litem at the start of the dependency proceedings due to her mental illness.  We shall affirm the juvenile court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 24, 2012, the Sonoma County Department of Human Services (Department) filed a juvenile dependency petition alleging then two-year-old Z.R. came within section 300, subdivisions (a), (b), and (g).[2]  The petition alleged that on or about

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  Most of the facts regarding events occurring before the section 366.26 hearing are taken from our prior nonpublished opinion in this matter, filed on February 20, 2013,

February 19, petitioner was observed in a local Whole Foods market to be shaking Z.R. in an aggressive and unsafe manner, that she exhibited delusional and psychotic behaviors and that as a result of the incident, petitioner was placed on an involuntary psychiatric hold pursuant to section 5150. The petition alleged petitioner had mental health issues that rendered her unable to provide adequate care and supervision for Z.R., placing him at substantial risk of harm. The petition further alleged that Z.R.'s father was incarcerated in state prison, rendering him unable to provide care and support for Z.R.

At the February 27 detention hearing, at which appellant was not present, the juvenile court appointed counsel for appellant and asked counsel to inform the court if a guardian ad litem would be required.

The jurisdiction report filed by the Department on March 23, related that petitioner had a 20-year history of mental illness and had approximately five to six section 5150 involuntary psychiatric holds since 2005, as well as recent psychiatric hospitalizations. The maternal grandmother stated that recently, petitioner had been saying that she talks to Jesus and that she has implants from the CIA. The grandmother could see petitioner was going into a psychotic break. During the incident at Whole Foods, the report relates the bizarre behavior engaged in by petitioner in addition to her aggressively shaking Z.R., including, among other things, her talking gibberish loudly on the phone, singing at one point, throwing objects, including a jar of baby food across Z.R.'s head into the basket, and trying to wrap him in her shawl like a mummy. When confronted, petitioner began to yell and scream up and down the store's aisles, grabbed Z.R. and at one point threatened to run into traffic with him.

Petitioner was admitted to psychiatric care from February 20, to February 22. She was released and readmitted a day later on February 23, when, while caring for Z.R., she was observed to be exhibiting unsafe and aggressive behaviors resulting in law enforcement intervention. An emergency protective custody warrant was necessary for

---

in which we denied appellant's petition for extraordinary writ, pursuant to California Rules of Court, rule 8.452 (rule 8.452). (*Stephanie R. v. Superior Court* (A136924).)

2

Z.R.'s safety. Petitioner remained in psychiatric care from February 23, to March 8. During that hospitalization, petitioner had to be given a *Riese*[3] hearing to force her to take Risperidone, the psychotropic medication prescribed for her. After her release, she did not take the recommended medication, despite having stated upon release that she saw the benefits of continuing on Risperidone after her discharge, and she was again admitted to the psychiatric hospital on March 13. Upon her release from that hospitalization on March 20, petitioner stated she was willing to take the Risperidone and added she had been taking it and it had been helping her.

Family members recounted instances of petitioner physically abusing her two older children (now adults) when they were young, including her breaking the nose of her then three-year-old son. Because of her mental illness, petitioner did not raise her older children who lived with other family members. The report listed several prior welfare referrals for petitioner's older children. Others had witnessed mother behaving toward Z.R. as she had toward her older children, shouting at him for no reason and handling him very roughly. Petitioner denied being aggressive with Z.R. at Whole Foods and denied ever being aggressive toward him. She explained that Z.R. was controlling the cart and making it go back and forth. She believed she had waited too long to take her Valium for her chronic pain.

On May 29, all parties submitted to the juvenile court's jurisdiction, and the court sustained the amended petition.

The disposition report, filed on June 26, related that at the time the social worker interviewed petitioner, she had just been released from a psychiatric hospital, but she was readmitted the following day. During the initial evaluation by the Department social worker, petitioner "continued to deny and minimize her mental health issues and present[s] as though she does not believe that she needs to take medication [for her mental health issues]." Petitioner has had several different diagnoses, such as

---

[3] *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312-1313.

schizophrenia, schizoaffective disorder, Bipolar disorder and marijuana abuse. She was also previously diagnosed with ADHD (attention deficit hyperactivity disorder), PTSD (post traumatic stress disorder) and a history of methamphetamine abuse.

Two psychologists, Gloria Speicher and Carolyn Crimmins, each independently evaluated petitioner for purposes of determining whether reunification services should be provided. Among other things, they each conducted a clinical interview with petitioner, administered various psychological tests, and reviewed relevant history and medical records. Each prepared a report for the court, detailing the procedures and testing used, the test results, and conclusions based upon the evaluation. Each explained those conclusions thoroughly. Each specifically addressed written questions relating to the applicability of the bypass statute, section 361.5, subdivision (b)(2). Each concluded petitioner suffered from a mental disorder. Speicher identified it primarily as Psychotic Disorder, NOS, and Crimmins diagnosed Schizoaffective Disorder.

Speicher's report explained that the diagnoses from petitioner's previous involuntary psychiatric hospitalizations varied because "there are several different possible etiologies for psychotic symptoms and history is typically difficult to obtain reliably and to verify on short notice." "Given her history of drug abuse that includes methamphetamines and reluctance to provide historically pertinent data, it is hard to make a differential diagnosis between the various elements of manic behavior found in Bipolar Disorder with psychotic symptoms, Schizoaffective Disorder or Substance-Induced Psychotic Disorder. [Petitioner] continues to assert that her behaviors are due to Attention Deficit Disorder and fails to acknowledge the seriousness of her behaviors or her mental illness. She fails to understand or acknowledge that [ADD] does not exhibit with psychotic symptoms of delusion and paranoia or the extremes of pressured speech, tangentiality, flights of ideas and incoherence that she manifests." Petitioner was unable to recognize the impact of her mental illness on her ability to respond to her child's needs. She was not able to manage her mental illness in a way that provided consistency for Z.R.. The prognosis was "poor." Speicher's report concluded: "Results of the evaluation suggest that [petitioner] cannot benefit from services within the time frame

4

allowed by the courts for reunification. It is not likely that [she] would be able to demonstrate appropriate and consistent management of her mental illness over a lengthy period of time and change her behaviors in the amount of time allowed for reunification with her child."

Crimmins's report diagnosed petitioner as suffering from "Schizoaffective Disorder, which greatly impacts her ability to function in all areas and renders her incapable of adequately caring for and coping with a young child."[4] Crimmins also opined petitioner suffered from "anosagnosia," which she described as "a neuro-psychiatric symptom or syndrome where the person is really unable to recognize that they're ill . . . ." Crimmins came to this conclusion because of the way petitioner described her hospitalizations, denying any kind of psychotic type symptoms, no matter how well documented. "She felt that the diagnosis was incorrect, the medications were incorrect, and that ADHD was the more appropriate diagnosis for her." Crimmins related the difficulties that such belief posed for treatment, most critically an unwillingness to take required medications, making it "very unlikely that you'll be able to remain stable for any period of time." She also testified that, "[i]n psychotic disorders it's exceptionally rare to have one psychotic episode unless it's say substance induced; it's usually a chronic process. There's a history of several hospitalizations with similar symptoms and they seem to be related to not taking the medication. By the time you've had about two or three psychotic breaks, there's about an 80-percent chance that you'll have another one." As to the question whether the mental disability would render petitioner incapable of using reunification services, Crimmins concluded that "[g]iven her history, lack of insight, level of emotional and behavioral instability and ambivalence

---

**4** Crimmins also explained that she and Speicher could have reached somewhat differing diagnoses of petitioner's mental disability because, "at that stage, the psychotic symptoms were more prominent, when I saw [petitioner], there was a fair amount of depressive symptomology, and so I felt that both the psychosis and the mood disorder were important parts of the treatment and that they really were affecting her equally, and I think perhaps Dr. Speicher wasn't seeing those at the time that she had assessed her."

regarding medication, it is unlikely that [petitioner] would be able to adequately use and benefit from the services currently available to her in the time period available. [¶] . . . [¶] Continuation of services is not recommended."

Social worker Dara Chanin testified that she spoke with petitioner a few weeks before the hearing to determine whether petitioner's beliefs about her diagnosis has changed and petitioner "said that she believed that it was still ADHD and that she did not believe that she had schizoaffective disorder." Petitioner also told Chanin that she felt that the Risperidone "doesn't really make much of a difference," but that she took it even though it made her sick some of the time as she believed it was a fine treatment for PTSD. Petitioner also added that she believed Risperidone was "poison to her."

The trial court found pursuant to section 361.5, subdivision (b), that reunification services shall not be provided to petitioner based upon clear and convincing evidence that she "is suffering from a mental disability that renders [her] incapable of utilizing reunification services and . . . that qualified mental health professionals have established, by clear and convincing evidence, that the parent is unlikely to be able to care for Z.R. within the maximum reunification period." The court also denied reunification services to the father on the ground that he was not interested in receiving them and had knowingly and intelligently executed a written waiver of reunification services. (§ 361.5, subd. (b)(14).)

On February 20, 2013, we denied appellant's petition for extraordinary writ, filed pursuant to rule 8.452, in which she sought review of the juvenile court's findings and orders denying her reunification services and setting the matter a section 366.26 hearing.

In the section 366.26 report, filed on February 14, 2013, the social worker reported that appellant was consistently visiting Z.R. two times per month. During visits, appellant fed, talked to, and played with Z.R., although the visits often reflected her lack of understanding of Z.R.'s "age and development as it relates to his needs and cues." Z.R. transitioned smoothly into and out of visits, happily returning to his foster parents at the end of visits.

6

At the request of appellant's attorney, on January 28, a bonding study had been completed. The examining psychologist determined that Z.R. had an "anxious-avoidant attachment" to appellant and that termination of parental rights would not be detrimental to him. In addition, an adoption assessment, completed on January 31, indicated that Z.R. had been living in a fost-adopt home for about six months. The prospective adoptive parents were committed to adopting Z.R., and he had developed substantial emotional ties to them.

The Department recommended that parental rights be terminated and a plan of adoption ordered.

At the April 29, 2013, section 366.26 hearing, appellant testified about the care she had provided for Z.R. before he was removed from her custody and the strong attachment between them. She also testified about her visits with him and their positive interactions during those visits. She further testified regarding ways in which she met Z.R.'s physical, emotional, and psychological needs. Finally, she confirmed her understanding that, if her parental rights were terminated, she would lose the right to see Z.R., and stated that she was opposed to termination.

At the conclusion of the section 366.26 hearing, the juvenile court found that Z.R. was adoptable and, while commending appellant "for all she has done in demonstrating her love and affection" for Z.R., further found that she had not satisfied her burden of showing that the beneficial parent-child relationship exception to adoption applied. The court therefore terminated appellant's parental rights and ordered a permanent plan of adoption.[5]

On June 11, 2013, appellant filed a notice of appeal.

### DISCUSSION

Appellant does not challenge the sufficiency of the evidence supporting the juvenile court's orders, but instead argues only that the court committed reversible error

---

[5] The court also terminated the parental rights of Z.R.'s father, who is not a party to this appeal.

by failing to appoint a guardian ad litem at the inception of the proceedings due to her mental illness.

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. [Citations.] The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. [Citations.] The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing. [Citations.]" (*In re James F.* (2008) 42 Cal.4th 901, 910, citing, inter alia, Code Civ. Proc., § 372.)[6] In a juvenile dependency case, the test of mental incompetence "is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. [Citations.]" (*In re James F.*, at p. 910.)

"[E]rror in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding is trial error that is amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice." (*In re James F.*, *supra*, 42 Cal.4th at p. 915.) Under the harmless error standard, "[w]e do not set aside the judgment unless a different result would have been probable had the error not occurred. [Citation.]" (*In re A.C.* (2008) 166 Cal.App.4th 146, 157.)

The Department argues that appellant has forfeited this issue by failing to raise it at any point during the juvenile court proceedings. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293; but see *In re A.C.* (2008) 166 Cal.App.4th 146, 156 [declining to apply waiver rule even though parent had not challenged failure to appoint a guardian ad litem

---

[6] Code of Civil Procedure section 372, subdivision (a), provides in relevant part: "When a minor, an incompetent person, or a person for whom a conservator has been appointed is a party, that person shall appear either by a guardian or conservator of the estate or by a guardian ad litem appointed by the court in which the action or proceeding is pending . . . ."

in juvenile court or by way of a writ petition]; *In re M.F.* (2008) 161 Cal.App.4th 673, 682 [same].)

Assuming, without deciding, both that (1) the issue is not forfeited, even as to events occurring before the section 366.26 hearing, and (2) the trial court erred in failing to appoint a guardian ad litem at the start of the dependency proceedings, we conclude that appellant was not prejudiced by the error. (See *In re A.C.*, *supra*, 166 Cal.App.4th at p. 157.)

In *In re A.C.*, *supra*, 166 Cal.App.4th at pages 157-158, the appellate court first rejected the father's claim that failure to appoint a guardian ad litem necessarily constituted a violation of due process. The court did find that because a conservator had not been appointed for the father (see Code Civ. Proc., § 372), the juvenile court had not complied with the requirements of section 372. (*In re A.C.*, at p. 156.) Nonetheless, the court found that, unlike cases in which the juvenile court did not hold a hearing before *appointing* a guardian ad litem on incompetence grounds, *failure to appoint* a guardian ad litem "does not mean the parent has been denied notice and an opportunity to be heard regarding his interest in a child's companionship, care, and custody." (*Id*. at p. 157.) The court further found that the father had received notice throughout the proceedings, had attended most of the hearings, and had been represented by appointed counsel from the outset. (*Id*. at p. 158.) Under those circumstances, the juvenile court's failure to comply with section 372 did not violate the father's rights. (*Ibid*.)

The *In re A.C.* court also concluded that the father's interests "were not substantially prejudiced" because, inter alia, while his attorney had submitted on the issue of jurisdiction, he had not submitted at the dispositional phase and in fact had sought both services and visitation for the father. (*In re A.C.*, *supra*, 166 Cal.App.4th at p. 159.) More importantly, the father was a conservatee who was "gravely disabled due to mental illness," and necessarily was unable to provide for his basic needs. (*Ibid*.) "Given that [the father] was incapable of caring for his own needs, there is no doubt that he could not care for his daughter. Thus, placement with [the father] under . . . section 361.2 was out

9

of the question. . . ." For these reasons, the court concluded that a different result would not have been probable had the error not occurred. (*Ibid*.)

Here, as in *In re A.C.*, we find that appellant's due process rights were not implicated by the juvenile court's alleged error. (See *In re A.C.*, *supra*, 166 Cal.App.4th at pp. 157-158.) Appellant was represented by counsel from the beginning of these proceedings, and counsel never raised the issue of incompetence, even after the juvenile court inquired about that possibility very early in the proceedings.[7] Nor is there evidence in the record suggesting that procedural deficiencies occurred due to the absence of a guardian ad litem.

Although, at the time of the jurisdiction hearing, appellant submitted on the amended petition, counsel informed the court that "Stephanie is really stable right now. She's on a really good constellation of medication," and, rather than having appellant have to explain what happened at Whole Foods, she was prepared to admit that and submit on jurisdiction. Counsel also stated that she would provide two statements from appellant disputing some of the facts alleged in the petition. Appellant also made several statements to the social worker, which were included in the jurisdiction report, in which she acknowledged that she had been boisterous during the incident at Whole Foods and should have taken her medication. But she also denied shaking Z.R. and disputed allegations about her mental health.

At the disposition hearing, appellant answered counsel's questions coherently and also testified that her medication was working and was helping her to maintain an "even keel." At the section 366.26 hearing, appellant responded positively in response to counsel's many questions regarding her care for and bond with Z.R., her positive interactions with him during visits, and the ways in which she met his needs. Finally,

---

[7] At the February 27, 2012, detention hearing, the juvenile court appointed counsel for appellant. The court then asked counsel to inform the court as to whether a guardian ad litem would be required. Counsel indicated that, after she had spoken to her client, she might make an ex parte application for appointment of a guardian ad litem.

appellant affirmed her understanding that, if her parental rights were terminated, she would lose the right to see Z.R., and expressed her opposition to such an outcome.

Thus, appellant was ably represented by counsel throughout the proceedings and, despite her mental illness, was able to advocate for herself and assist counsel in the proceedings. In light of these circumstances, we conclude that any failure by the juvenile court to comply with section 372 did not violate appellant's due process rights. (See *In re A.C.*, *supra*, 166 Cal.App.4th at pp. 157-158.)[8]

We also find that appellant's interests were not substantially prejudiced by the court's failure to appoint a guardian ad litem. (See *In re A.C.*, *supra*, 166 Cal.App.4th at p. 159.) In addition to the lack of prejudice from the alleged procedural deficiencies in the proceedings (see *ante*), given appellant's mental health issues, a different outcome at the section 366.26 hearing would have been extremely unlikely.

First, although appellant submitted on the issue of jurisdiction, it is virtually certain that the court would have taken jurisdiction in any event, given the degree of appellant's mental illness and the fact that she had been observed acting bizarrely and exhibiting unsafe and aggressive behaviors toward her son before he was detained. Second, even though she had become more stable with medication, appellant continued to

---

[8] This case is distinguishable from *In re M.F.*, *supra*, 161 Cal.App.4th at pages 678, 681, cited by appellant, in which the 14-year-old mother had waived her right to appear at the jurisdictional hearing and her attorney had appeared without her at the dispositional and six-month review hearings without offering any evidence or argument. The mother argued on appeal that the juvenile court had erred in failing to appoint a guardian ad litem until just before the section 366.26 hearing. (*In re M.F.*, at pp. 678, 681) The appellate court reversed the order terminating parental rights after concluding that the rights of the mother, who had been abused by her stepfather and was not herself accused of any wrongful conduct, were compromised at key hearings, including the jurisdiction hearing. (*Id*. at p. 681; see also *In re D.D.* (2006) 144 Cal.App.4th 646, 654 [failure of juvenile court to appoint a guardian ad litem, failure to appoint an attorney, and lack of notice to minor father, in combination, rendered proceedings fundamentally unfair].) Here, appellant is not a minor and the dependency petition in this case did allege wrongful conduct on her part. She also was represented by counsel and participated in every hearing except the jurisdictional hearing. As already discussed, her rights were not compromised by the court's failure to appoint a guardian ad litem.

suffer from severe mental illness that hindered her ability to form a healthy bond with her son. As the bonding study showed, Z.R. had an "anxious-avoidant attachment" to appellant, which led the examining psychologist to conclude that termination of appellant's parental rights would not be detrimental to him. Z.R., who had been found adoptable, was in a fost-adopt home with prospective adoptive parents who were committed to adopting him and with whom he had developed substantial emotional ties.

We conclude it is not probable that the juvenile court would have declined to terminate appellant's parental rights had it appointed a guardian ad litem at the start of the proceedings. (See *In re A.C.*, *supra*, 166 Cal.App.4th at pp. 158-159.)

### *DISPOSITION*

The juvenile court's order terminating appellant's parental rights with respect to Z.R. is affirmed.


_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Brick, J.*


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.