Filed 5/27/15  Conservatorship of J.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of J.M. | C077649 |
| EL DORADO COUNTY PUBLIC GUARDIAN, as Conservator, etc., | (Super. Ct. No. PMH20140082) |
| Petitioner and Respondent, | |
| v. | |
| J.M., | |
| Objector and Appellant. | |

Joyce M. is subject to a Lanterman-Petris-Short Act (LPS Act)[1] conservatorship.

On appeal, she challenges the trial court's finding that she is gravely disabled as a result

---

[1]  Welf. & Inst. Code, § 5000 et seq.; further undesignated statutory references are to the Welfare and Institutions Code.

of a mental disorder and unable to provide for her basic personal needs of food, shelter, or clothing. She claims there is no substantial evidence to support the finding of grave disability. Joyce also contends the trial court lacked sufficient evidence to support the imposition of special disabilities denying her the rights and privileges to possess or carry firearms, possess a driver's license, enter into contracts, and give or withhold consent to medical treatment both related and unrelated to her grave disability. We affirm.

BACKGROUND

*Grave Disability*

Between April 28, 2014, and May 29, 2014, Joyce was placed on a section 5150 hold three separate times. Two of those holds were based on a finding that Joyce was gravely disabled and resulted in her being admitted to Woodland Memorial Hospital.[2] Joyce was admitted to Woodland Memorial Hospital on May 15, 2014, and released on May 23, 2014. She was then re-admitted on May 29, 2014, (again based on a finding she was gravely disabled) after less than six days at home. Joyce was not released from this section 5150 hospitalization during the pendency of these conservatorship proceedings. The current hospitalization occurred after the police department received an anonymous call to do a welfare check on Joyce. Law enforcement found her house disorganized, with broken windows and broken glass on the floor. She was not able to care for her basic needs.

Dr. Kanchanakin, a psychiatrist at Woodland Memorial Hospital, saw Joyce every day during both section 5150 commitments at that hospital. On the two occasions Joyce was released from the hospital she was given a discharge plan, which included medication. Joyce did not take her medication following discharge and, in both cases, was readmitted to a psychiatric hospital within two weeks. Based on his evaluation of

---

[2] Joyce did not challenge the validity of those determinations of grave disability.

2

Joyce, Dr. Kanchanakin concluded Joyce was gravely disabled and not able to meet her basic needs for food, clothing, or shelter.

Dr. Kanchanakin diagnosed Joyce with bipolar disorder with psychotic features, most recently manic. He noted her thought processes were tangential, disorganized, and fragmented. She was delusional and had poor insight and judgment. Joyce struggled with delusions of erotic mania, inappropriate intrusiveness, rage attacks, and emotional lability. Joyce also had numerous physical ailments that required treatment, including adult onset kidney disease, chronic renal failure, hypertension, hyperthyroidism, osteoporosis, spinal stenosis, pre-diabetic condition, and peripheral neuropathy. Joyce's mental health history goes back 30-40 years with consistent diagnoses of bipolar disorder. Over the last 39 years, she's had approximately half a dozen "mental health episodes," spaced years or decades apart. Joyce's "episodes" included symptoms such as delusions, confusion, and abnormal behaviors. For over 20 years she had successfully been treated with Lithium as her primary psychotropic medication, until early 2014 when she was hospitalized for Lithium toxicity.

Joyce's husband died December 2013 and since that time there had been numerous calls to adult protective services as Joyce was having more trouble caring for herself. In late 2013 through early 2014 Joyce had an in-home caregiver, Armida. Armida came daily for two months and Joyce paid her $3,000 a month. Joyce fired Armida in March or April of 2014 because she thought Armida was lying to her and stealing from her. Officer Aaron Lopez, a deputy with the El Dorado County Sheriff's Department, was assigned to Joyce for crisis intervention. He responded to Joyce's home on two occasions for welfare concerns. In late April 2014 he responded to her call reporting that her daughter was trying to kill her. Lopez identified himself and told her he was there to investigate her call for service. She told him she did not want his help, called 911, and reported he was harassing her. She then abruptly indicated she was having chest pains and needed medical attention, so Lopez called for paramedics. Lopez's second visit

3

came after Joyce contacted an emergency call center, through a device worn around her neck, and reported that she was going to burn her house down. The call center asked law enforcement to conduct a welfare check. Lopez advised Joyce why he was there and she said she "would burn the house before they took the house away from her." Lopez noted there was debris in the house, a full urinal with an open lid in the living room, and dishes and Styrofoam everywhere. Joyce was appropriately dressed on both visits, there appeared to be edible food in the home, and there was running water and electricity. Joyce even offered Lopez some shrimp she had apparently purchased that day. Lopez did not place Joyce on a section 5150 hold after either of those visits.

Marlene Hensley, the LPS Investigator assigned to evaluate whether Joyce should be placed in a LPS conservatorship, testified as an expert in investigating LPS referrals, writing LPS referral reports, and making LPS recommendations.[3] As part of her investigation she met with Joyce, reviewed records from Woodland Memorial Hospital,

---

[3] Joyce contends Hensley's trial testimony was not admissible for the truth of the matter asserted because she relied on hearsay reports and interviews. It is true Hensley's report was not admissible. (*Conservatorship of Manton* (1985) 39 Cal.3d 645.) Hensley, however, testified as an expert in making recommendations regarding LPS conservatorships. Her expertise necessarily includes assessing whether the proposed conservatee is gravely disabled. In forming her expert opinions, Hensley was entitled to "rely on hearsay including statements made by the patient or by third persons." (*Conservatorship of Torres* (1986) 180 Cal.App.3d 1159, 1163.) She was also entitled to rely on the observations of mental health professionals, such as those contained in the patient's medical records, because such information is "of a type that reasonably may be relied upon by an expert." (Evid. Code, § 801, subd. (b); see also *People v. Campos* (1995) 32 Cal.App.4th 304, 307-308.) There was no objection to her qualifications to testify as an expert in recommending conservatorships or on the issues involved in making that recommendation, including Joyce's ability to provide food, clothing, or shelter for herself. Nor was there any hearsay objection to Hensley's trial testimony. In fact, at one point, trial counsel indicated, to the extent Hensley testified in court to matters contained in the report, the court could rely on that testimony. The failure to "make a timely and specific objection" at trial forfeits the issue on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 433-434; Evid. Code § 353.)

4

the County Conservator's Office, adult protective services reports, and police reports. She spoke with Joyce's psychiatrist at El Dorado County Mental Health, Dr. Joe Kanchanakin, the El Dorado County Director of Mental Health, Dr. Robert Price, and Joyce's son, ex-husband, and neighbors. She was also in constant contact with the social worker at Woodland Memorial Hospital. When considering whether to recommend an LPS conservatorship, Hensley considers: 1) whether there is a chronic and persistent severe mental illness; 2) whether the patient is willing to accept treatment, such as medication and case management; 3) the track record for compliance with the treatment program; and 4) whether the person can provide for their food, clothing, or shelter.

Hensley reported that during her most recent hospitalization, Joyce did not understand why she was hospitalized, refused to accept her bipolar diagnosis, and insisted she did not need medication. Joyce made it clear to Hensley that taking medication was not a significant consideration for her. Joyce refused to consider any alternative living arrangements. Her plan was to return home as she had after being discharged in the past. Joyce also lacked insight into her situation, she did not believe anything was wrong with her, and did not see any need to be in the hospital or talking about conservatorship. Joyce's statements, and her history of not staying on her medication upon being released from the hospital, indicated to Hensley that Joyce would not be compliant with treatment. Hensley discussed Joyce's plan for self-care with her. Joyce told Hensley she would drive to the store to get food and clothing. She would then "stand at the car and take one item at a time and throw it up on the porch one item at a time. She would climb up and she would carry it into the house bit by bit." Joyce had a suspended driver's license and utilized both a wheelchair and a walker.

Hensley expressed concern about Joyce's "inability or unwillingness to accept outside assistance, such as when she calls for the police, then doesn't let them in, and the IPS worker is fired and Adult Protective Services' assistance, those . . . we're fearful she would say no to [that assistance], once home." Based on the evidence of Joyce's mental

5

illness, her lack of insight into her mental illness and lack of compliance with medication, her unwillingness to accept assistance, and her three psychiatric hospitalizations within a one-month period, Hensley recommended Joyce be placed in conservatorship.

Mari Robertson, the El Dorado County public guardian, testified as an expert in planning for someone who is gravely disabled. Joyce received social security benefits of $1,650 per month, plus a teacher's pension of $1,300 per month. She had a reverse mortgage, $10,000 in a savings account, and Kaiser medical insurance. Joyce reported she would comply with mental health groups and go to the doctor. She would also have help at the house and getting to the grocery store, and she would try to find her former caregiver to help her again. She claimed her hospitalization was a mistake and that she did not need to be in a placement to treat her mental illness. Robertson visited Joyce's home and, although it was messy and needed to be cleaned, it "wasn't really terrible." She believed it was not entirely safe for someone with Joyce's physical limitations, and thought it would be best if the house could be retrofitted for Joyce's physical needs with guardrails, grab bars, and ramps. Robertson met with staff at the board and care home where Joyce was placed after the imposition of this conservatorship. Joyce was not taking her medications, and was refusing the psychotropic medication that had been prescribed. Joyce was also refusing to take penicillin to treat an abscessed tooth and refusing to take cough syrup. Joyce questioned her bipolar diagnosis. The doctor stated Joyce needed 24-hour supervision to ensure medication compliance. Robertson concluded it would not be sufficient for Joyce to hire her own caregiver, in lieu of a conservatorship, because a caregiver or friend would not be able to ensure she was medication and treatment compliant. Robertson also concluded, based on her conversations with Joyce and Joyce's history, that without oversight, Joyce would not be medication compliant.

Sandra Ann Wessels and Gena Brown were both long-term friends of Joyce. They each stayed in touch with her and were willing to help her. Wessels was willing to help

6

Joyce with transportation, take her to the grocery store, and to the doctor. Wessels stated she could assist Joyce "at times," but was uncertain how often since she was also caring for her terminally-ill husband. Wessels reported Joyce was fine when medicated, but when not medicated she needed someone to be around to help her. Wessels would not require Joyce to take her medication. If she felt Joyce was in harm's way, she would call someone to help her. Brown said she and her family would assist with cleaning, chores, and grocery shopping. In the months prior to Joyce's most recent hospitalizations, Brown was at Joyce's home almost every day helping her with cleaning, chores, and taking her grocery shopping. Brown had never discussed medical or mental health issues with Joyce.

Joyce testified on her own behalf. She indicated at the end of 2013, she had been hospitalized after injuring her leg. At the time, she had a caregiver, Armida, helping her at home. Joyce also had friends and neighbors who helped her. Armida took wonderful care of her and kept her from dying after her stepdaughter left her on the couch to die.[4] Armida came to Joyce's home every day for two months, and Joyce paid her $3,000 a month. Then Armida started lying to Joyce and she fired her.

Joyce acknowledged she had some accidents with her electric cart resulting in injuries, and that she had called law enforcement claiming her stepdaughter was trying to kill her for her land. Joyce also believed her stepdaughter had stolen at least $20,000 from her, because her husband forced her to put the stepdaughter's name on the checking account. She claimed that she had $7,000 in her house from gambling winnings that "was gone." While she was hospitalized, she realized that her social security and retirement checks had been cashed by someone else. She also called law enforcement indicating her neighbor was trying to kill her. Responding to a question about whether

---

[4] The stepdaughter had a restraining order against Joyce.

7

she had a driver's license, she explained that law enforcement officers threatened to take her license away because they did not think she should be driving. Her response had been to take the truck out, show them she could parallel park, and "spin on a dime with the best of them. [¶] And that's the last [Joyce] heard about the suspension." Joyce denied ever refusing entry to a Sheriff, clarifying it was the policemen she did not want to come into her home. She also denied pulling a knife on a Deputy Sheriff, stating he was pinning her to the counter and she grabbed a knife to defend herself.

Joyce complained about unethical treatment from her doctor, Dr. Wong, and a nurse at Kaiser. She felt she had been abused at Woodland Memorial by Dr. Kanchanakin and that the hospital staff had lied both to her and about her. She reported the nurses were jealous of her, that someone at the hospital had taken $900 from her purse, and that they did not give her clothes to wear. Joyce stated she saw Dr. Kanchanakin every day while at Woodland Memorial. At first she liked him, but then began to believe he was deceiving her.

With respect to her psychiatric hospitalizations, she did not think she should have been hospitalized. She stated her mental disorder was a mental gift. She reported her Kaiser psychiatrist, Dr. Silverman, told her she was not manic depressive and wanted to discontinue her psychotropic medication, but Woodland Hospital would not let him. She acknowledged she needed to control her mental gift, but had not been very successful in doing so. Her plan to control her mental gift was to take her medication as prescribed by Silverman.

Joyce planned to live in her home and get transportation and home services from "SSI" or Kaiser. She could also use programs that provide transportation to senior citizens or rely on friends. She denied that her driver's license was suspended, but said someone at the hospital had stolen it. She said she would accept help from her friends and would comply with the recommendations of the psychiatrist. Joyce later acknowledged that, upon release from previous hospitalizations, she had agreed to

8

continue taking medication both related to her mental illness and physical ailments but had not done so.

The trial court found Joyce gravely disabled. The court noted there was little disagreement that Joyce suffered from a mental illness. The court also found that, while Joyce claims she takes her medication and is willing to follow the directions of Dr. Silverman, the records indicate she will not comply and will not take her medication. The court noted Joyce did not have a clear plan for assistance or alternative care. While Wessels and Brown appeared sincere in their offers of help; their assistance would be intermittent and spotty.

*Special Disabilities*

Dr. Price is the Medical Director of El Dorado County Mental Health and the current psychiatrist at El Dorado Psychiatric Health Facility. He reviewed Joyce's records with Hensley and submitted recommendations on the imposition of special disabilities. Dr. Price recommended Joyce be denied the right to possess firearms and a driver's license due to her poor impulse control, lack of insight, and impaired judgment. He also recommended she be denied the right to enter into contracts due to poor impulse control, lack of insight, impaired judgment and that she was subject to undue influence. As to medical treatment, he recommended she be denied the right to refuse or consent to treatment both related and unrelated to the issues of her grave disability due to her poor impulse control, lack of insight, impaired judgment, and inability to care for herself. The trial court denied Joyce the rights and privileges to possess or carry firearms, possess a driver's license, enter into contracts, and give or withhold consent to medical treatment both related and unrelated to her grave disability.

## DISCUSSION

### I.

### *Expert Testimony, Lack of Insight and Refusal to Take Medication Support the Trial Court's Finding That Joyce Is Gravely Disabled.*

Joyce contends there is no substantial evidence supporting the conclusion that she is gravely disabled as a result of a mental disorder. We disagree.

In proceedings under the LPS Act to establish a conservatorship, the public guardian must prove beyond a reasonable doubt that the proposed conservatee is presently gravely disabled. (Welf. & Inst. Code, § 5350; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235; *Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 696 (*Johnson*); *Conservatorship of Jones* (1989) 208 Cal.App.3d 292, 302-303.) As relevant to this case, "gravely disabled" is defined as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A); *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134 (*Carol K.*).)

When reviewing the establishment of a conservatorship, we employ the substantial evidence test to determine whether the record supports a finding of grave disability. We review the whole record in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence in support of that judgment. Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 (*Walker*).) "We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) Evidence from a single witness may be sufficient to support such a finding. (*Johnson, supra*, 235 Cal.App.3d at p. 697.)

"The conservator must show the conservatee is presently gravely disabled and not that [s]he may relapse and become gravely disabled in the future." (*Conservatorship of*

10

*Guerrero* (1999) 69 Cal.App.4th 442, 446.) Where the evidence establishes a person is not presently gravely disabled, but may become so because of a future failure to take medication, an LPS conservatorship cannot be established on that ground alone. (*Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1033 [expert witnesses testified conservatee was presently able to provide for food clothing, and shelter, but given propensity to not take medication, would likely regress and become gravely disabled "in a fairly short period of time" if released]; *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 17-18 [expert witnesses testified the conservatee was "presently capable of managing his own affairs," but if released would likely relapse into alcohol abuse and become gravely disabled "at some future time].) However, a lack of insight into one's mental illness combined with a refusal to take prescribed medication can provide evidence in support of a finding that a conservatee is presently gravely disabled. (*Walker, supra*, 206 Cal.App.3d at p. 1577; *Guerrero, supra*, 69 Cal.App.4th at pp. 446-447.)

Joyce does not challenge the sufficiency of the evidence that she has a mental disorder. She challenges only the finding that her mental disorder renders her unable to meet her personal needs for food, clothing, or shelter. Under the substantial evidence standard, we do not determine whether the evidence established grave disability beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) We decide only whether there is substantial evidence—evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the public guardian had met its burden of proving the prospective conservatee was gravely disabled beyond a reasonable doubt. (*Ibid.*) On this record, there is substantial evidence that supports the trial court's finding.

Joyce relies on *Conservatorship of Smith* (1986) 187 Cal.App.3d 903 to support her claim that the condition of her home and her bizarre behavior are not sufficient to support a finding of grave disability. Smith suffered from delusions that commanded her

11

to maintain a vigil outside a particular church. Sometimes she would go inside the church and disrupt services. (*Id.* at p. 910.) It also resulted in her sleeping on the sidewalk in front of the church at night. Smith had neither income nor a permanent home. She accepted food and money from friends and family. There was no evidence she was malnourished, overexposed, or suffering any other symptoms of poor health. (*Ibid.*) The examining psychiatrist concluded that in spite of a mental disorder, which brought Smith into conflict with the community, "her cognitive intellect and most of her personality was intact and, despite the disorder, she could feed and clothe herself and provide for her own place to live." (*Id.* at p. 907.) The *Smith* court also made a point to note, "[o]ur conclusion might have changed had more extensive testimony on the effect of appellant's behavior on her health and well-being been elicited, or a more thorough investigation properly introduced into evidence been presented." (*Smith,* at p. 910.) In this case, unlike in *Smith*, there was additional evidence regarding the effect of Joyce's behavior on her health and well-being.

Joyce's history shows that when medicated she can live a functional life, successfully providing for her basic needs of food, clothing, and shelter. However, in the space of one month, Joyce was placed on a section 5150 hold on three separate occasions. On at least two of those occasions, she was found gravely disabled. "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled" section 5150 provides for a 72-hour hold of that person "for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services." (§ 5150, subd. (a).) "Grave disability" has the same definition for purposes of both the 72-hour hold under section 5150 and appointing a conservator under section 5350. (§§ 5008, subd. (h)(1)(A), 5150, subd. (h)(1).) That is, as a result of a mental health disorder, the person is unable to provide for their basic personal needs for food, clothing, or shelter.

As Joyce acknowledged, after the first two hospitalizations she was released with a discharge plan that included taking medication, but she did not comply with her medication treatment plan. As a result, she decompensated and was again admitted to the psychiatric hospital because she was gravely disabled. At least twice in one month, Joyce's refusal to take her medication resulted in findings that she was unable to provide for her basic needs for food, clothing or shelter.

The evidence before the trial court supported the finding that Joyce lacks insight into her mental illness. During the current hospitalization, Joyce did not understand why she had been hospitalized, denied her bipolar diagnosis, and insisted she did not need medication. The evidence also supports the finding that Joyce will not take her medication if she is released. In addition to her past history of failing to comply with a medication plan upon discharge, even while in the supervised setting of a board and care home, Joyce refused to take both her psychotropic medication and penicillin. The doctor at the board and care facility stated Joyce needed 24-hour supervision to ensure medication compliance. Robertson, the El Dorado County public guardian, opined Joyce needed care because it was apparent, based on her history and statements, that she would not be medication compliant without oversight. Joyce made clear that taking medication was not a significant consideration for her. Based on Joyce's statements and history, Hensley concluded Joyce would not be compliant with her medication. Joyce's three section 5150 holds between April and May show that when Joyce is not properly medicated, she decompensates to the point of becoming gravely disabled. Wessels also testified that when Joyce is unmedicated, she needs assistance. Dr. Kanchanakin evaluated Joyce and saw her every day during the two hospitalizations at Woodland Memorial Hospital. In his expert opinion, she was gravely disabled and not able to meet her basic needs for food, clothing, or shelter.

It was reasonable for the trial court to infer from this evidence that if Joyce were not conserved, she would not take her medication and would *continue* to be gravely

13

disabled.  It was also reasonable for the trial court to infer that Joyce's inability to care for herself was directly related to her lack of insight about her mental illness and her corresponding refusal to take her medication.  Joyce lacked insight into her mental illness, refused to consider any other living alternatives, and did not think she had a mental illness.  Unlike *Conservatorship of Murphy, supra,* and *Conservatorship of Benvenuto, supra,* the evidence in this case was not merely predictive that Joyce would become gravely disabled in the future.  Here, at the time of the trial court proceedings, Joyce disputed her diagnosis and refused to take psychotropic medication.  Her lack of insight into her mental illness and unwillingness to take medication were currently causing her grave disability, they had a demonstrable effect on her health and well-being, and there was no indication that situation would end.

The fact that on two recent occasions Joyce had been placed on section 5150 holds for being gravely disabled, the finding of the psychiatrist who treated her while she was subject to those holds that she was gravely disabled, and evidence that she lacked insight and would likely continue to refuse medication, all provide substantial evidence to support the trial court's finding.  (*Walker, supra,* 206 Cal.App.3d at p. 1577.)

II.

*There Are No "Family, Friends, or Others Who Are Both Willing and Able to Help Provide" Joyce's Basic Personal Needs Sufficient to Preclude Her from Being Gravely Disabled.*

Despite the trial court's finding that Joyce could not provide for her own basic needs for food, clothing and shelter, she would not be gravely disabled if she established that she could "survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for [her] basic personal needs for food, clothing, or shelter." (§ 5350, subd. (e)(1); see also

14

*Conservatorship of Early* (1983) 35 Cal.3d 244, 254.)[5] Joyce contends the testimony of her friends Wessels and Brown, that they were willing to help her meet her basic needs for food, clothing, and shelter, satisfied this burden. Wessels and Brown each testified they were willing to assist Joyce. Wessels could not commit to a schedule of how often she could help Joyce with transportation, because she was also caring for her terminally-ill husband. Wessels also made clear she would not require Joyce to take her medication. Brown testified she and her family would assist with cleaning, chores, and grocery shopping. In fact, for months prior to Joyce's most recent hospitalizations, Brown was at Joyce's home almost every day helping her with cleaning, chores, and taking her grocery shopping. During this time period, however, Joyce was placed on a section 5150 hold three times, at least twice because she was gravely disabled. Moreover, Brown had never discussed any medical or mental health issues with Joyce. Her offer of assistance did not appear to include requiring or assisting Joyce with taking her medication. A caregiver or friend would not be able to ensure Joyce was medication and treatment compliant. Even in the board and care home, Joyce refused medications. Moreover, Joyce's history strongly indicates that, even when she initiates the process, she will not accept assistance. She has sought crisis intervention and then denied access to her home. She hired an in-home caregiver and then fired her. Wessels and Brown's offers of assistance indicate they were willing to provide assistance to Joyce. They do not, however, demonstrate

---

[5] Section 5350, subdivision (e)(2) also provides: "However, unless they specifically indicate in writing their willingness and ability to help, family, friends, or others shall not be considered willing or able to provide this help." The purpose of this section "is to avoid the necessity for, and the harmful effects of, requiring family, friends, and others to publicly state, and requiring the court to publicly find, that no one is willing or able to assist a person with a mental health disorder in providing for the person's basic needs for food, clothing, or shelter." (§ 5350, subd. (e)(3).) Because Wessels and Brown testified at trial as to their willingness to assist Joyce, there would be no purpose served in also requiring them to have executed a writing. (*Conservatorship of Johnson, supra,* 235 Cal.App.3d at p. 699, fn. 5.)

15

their assistance would enable Joyce to survive safely.  (*Conservatorship of Johnson, supra*, 235 Cal.App.3d at p. 699.)  Accordingly, the trial court correctly found Wessels and Brown's assistance would not permit Joyce to survive safely, and avoid the need for a conservatorship.

## III.

### *The Imposition of Special Disabilities*

Joyce next contends there is no sufficient evidence to support the imposition of the special disabilities denying her the rights and privileges to possess or carry firearms, possess a driver's license, enter into contracts, vote and give or withhold consent to medical treatment unrelated to her disability.  We disagree.

A finding of grave disability alone is not sufficient to justify the imposition of the various special disabilities enumerated in section 5357.  (§ 5005; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312-1313 (*Riese*).)  The conservatee retains the rights and privileges covered by the special disabilities unless the court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities, and confers corresponding authority on the conservator.  (*Conservatorship of George H*. (2008) 169 Cal.App.4th 157, 165; *Riese, supra*, 209 Cal.App.3d at p. 1313.)  Because the special disabilities deprive the conservatee of substantial constitutional rights, due process must be afforded before these rights are compromised.  (§§ 5357, 5358; *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612.)  " 'The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' [Citation.]" (*Conservatorship of George H., supra*, 169 Cal.App.4th at p. 165.)  In other words, there must be evidence in the record to support each of the specific disabilities imposed.  (*Id.* at pp. 165-166.)

16

The trial court is not required to make a "specific, on-the-record statement of the reasons for each order" regarding a special disability. (*George H., supra*, 169 Cal.App.4th at p. 165.) Nor does a petitioner for an LPS conservatorship need to address each special disability by unique evidence directed at a particular disability. (*Ibid.*) We will affirm the trial court's imposition of special disabilities so long as substantial evidence supports each disability. (*Ibid*.)

Dr. Price recommended Joyce be denied the right to possess firearms and a driver's license due to her poor impulse control, lack of insight, and impaired judgment. He also recommended she be denied the right to enter into contracts due to the poor impulse control, lack of insight, impaired judgment, and that she was subject to undue influence. As to medical treatment, he recommended she be denied the right to refuse or consent to treatment both related and unrelated to the issues of her grave disability due to her poor impulse control, lack of insight, impaired judgment, and inability to care for herself. There is also testimonial evidence in the record that provides a basis for the imposition of the special disabilities.[6]

*Right to Possess a Firearm*

To support a limitation on a conservatee's ability to possess a firearm or deadly weapon, the court must find "that possession of a firearm or any other deadly weapon by the person would present a danger to the safety of the person or to others." (§ 8103, subd. (e)(1).) As indicated above, Joyce was most recently committed under section 5150 on May 29, 2014. Accordingly, under section 8103, subdivision (f) she was

---

[6] We note Dr. Price's form assessment would not, on its own, provide substantial evidence for the imposition of the special disabilities. The form itself does not indicate Price's title or qualifications, whether he examined Joyce, whether he reviewed any of her medical records or had any familiarity with her. The form does not provide any factual basis for Price's conclusions. Moreover, many of the "boxes" are not directly relevant to the imposition of the disability without more information.

restricted from possessing firearms for five years from that commitment. Dr. Price concluded Joyce should be denied the right to possess a firearm due to her poor impulse control, lack of insight, and impaired judgment. Dr. Kanchanakin noted Joyce suffered from rage attacks as part of her system of delusions. Joyce claimed her stepdaughter and neighbor were trying to kill her, and she pulled a knife on a sheriff deputy in what she claimed was self-defense. This was substantial evidence from which the trial court could conclude Joyce could not safely possess a firearm.

*Right to Possess a Driver's License*

Similarly, the overriding concern in the issuance of a driver's licenses is generally whether the person is able to operate a motor vehicle safely. (Veh. Code, §§ 12800, subd. (g), 12805, subd. (c), 12806, subd. (c); *People v. Superior Court* (*Wilson*) (1993) 18 Cal.App.4th 31, 36-37.) Mental disorders may affect a person's "ability to exercise reasonable and ordinary control in operating a motor vehicle" and may be the basis for refusing that person a driver's license. (Veh. Code, §§ 12800, subd. (g), 12806, subd. (c).) Again, Dr. Price concluded Joyce should be denied the right to drive due to poor impulse control, lack of insight, and impaired judgment. Drs. Kanchanakin, Price, and Hensley all indicated Joyce's license was already suspended. Law enforcement officers were also of the opinion Joyce should not be driving. It was reasonable for the court to infer Joyce could not safely operate a motor vehicle.

*Right to Contract*

Under Civil Code section 1556, persons of "unsound mind" are not capable of entering into contracts. There are essentially three classifications of incapacity based on an "unsound mind," (1) entirely without understanding (Civ. Code, § 38), (2) unsound but not entirely without understanding, and (3) susceptible to undue influence. (Civ. Code, § 39; *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835, disapproved on another point in *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 485-486.) Dr. Price indicated Joyce should be disabled from entering into contracts due to the poor impulse

18

control, lack of insight, impaired judgment, and that she was subject to undue influence. Joyce had a monthly income of approximately $2,950; yet she paid her in-home caregiver $3,000 a month. At her husband's behest, Joyce added her stepdaughter as a signatory to her checking account and then believed her stepdaughter stole $20,000 from her. The trial court could reasonably infer from this evidence that Joyce was subject to undue influence and not capable of entering into contracts.

*Right to Refuse or Consent to Medical Treatment*

In *Riese*, the Supreme Court outlined the factors to be evaluated by the court in considering whether a gravely disabled person is incapable of making medical treatment decisions: "(a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese, supra*, 209 Cal.App.3d at pp. 1322-1323.)

Using these criteria, the record supports the trial court's finding that Joyce was incompetent to make medical decisions, both related to her grave disability and unrelated to it.[7] Joyce exhibited extreme distrust of medical professionals. She complained about unethical treatment from Dr. Wong and a nurse at Kaiser, felt she had been abused at Woodland Memorial Hospital, believed Dr. Kanchanakin and the hospital staff lied to her and about her. She also believed the hospital staff had stolen money from her purse. She

---

[7] Based on the record in this case, we address these disabilities together. We acknowledge, however, these are distinct disabilities, to be imposed and considered separately by the trial court.

19

did not understand why she was hospitalized and, on more than one occasion, testified she was uncertain about the reason for being hospitalized.  She denied she suffered from any mental illness.  She refused medication and treatment both related and unrelated to her grave disability, including psychotropic medication, antibiotics and even cough syrup.  Upon being released from previous hospitalizations, Joyce agreed to a treatment plan including medication and had not complied with the plans.  This is substantial evidence supporting the trial court's finding.

DISPOSITION

The judgment is affirmed.



                                                 RENNER             , J.



We concur:



  BLEASE              , Acting P. J.



  HULL               , J.