Filed 9/23/25  Conservatorship of the Person of J.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| Conservatorship of the Person of J.C. | |
| SAN JOAQUIN COUNTY PUBLIC CONSERVATOR, as Conservator, etc.,<br><br>Petitioner and Respondent,<br><br>v.<br><br>J.C.,<br><br>Objector and Appellant. | C102618<br><br>(Super. Ct. No. STK-MH-LPSC-2016-0000094) |

Appellant J.C. appeals from the trial court's October 2024 nunc pro tunc order reappointing San Joaquin County Public Conservator (conservator) as J.C.'s conservator in February 2024 for one year (reappointment order), as well as its contemporaneous order imposing fees for a conservatorship that ended in September 2018 (fee order).  J.C. argues insufficient evidence supports the trial court's disability findings as to the reappointment order and the fee order is unauthorized and unreasonable.  We conclude

1

the reappointment order is supported by sufficient evidence and J.C. has failed to demonstrate error with the fee order. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

*Reappointment Order*

In January 2024, conservator petitioned for reappointment, which J.C. opposed. At the court trial, Dr. Timothy Miller testified as an expert in psychology. Dr. Miller met with J.C. twice and spoke to his caregiving team. Dr. Miller testified J.C. was 42 years old and suffered from schizoaffective disorder. Dr. Miller based this diagnosis on J.C.'s hallucinations and delusions about his health and the reasons underlying his conservatorship. He also based his diagnosis on J.C.'s poverty of speech, flat affect, lack of ambition, and social withdrawal. While J.C. did not refuse to take his prescribed medications, he often complained and voiced his belief the medications were harming him and the mental health system had conspired to keep him conserved. In Dr. Miller's experience, when patients like J.C. stop taking medication, they decompensate within a few weeks to a month. Dr. Miller believed J.C. would stop taking his medications if not under a conservatorship.

J.C. also had a long history of methamphetamine use, including between Dr. Miller's visits with J.C. J.C. believed methamphetamine improved his mental health, even though it is proven to worsen psychosis. Given J.C.'s relapse and feelings toward methamphetamine, Dr. Miller believed J.C. would return to using methamphetamine if not under a conservatorship. J.C. also admitted to enjoying the use of cannabis, and said it improved his mental and physical health, even though it has been proven to worsen the symptoms of J.C.'s mental health disorder when taken in large quantities. J.C.'s admission of enjoying cannabis made Dr. Miller believe J.C. would use cannabis if not under a conservatorship.

2

Dr. Miller did not believe J.C. could formulate a plan to obtain shelter given his disorganized thoughts, delusions, poor judgment, unrealistic planning, inability to acknowledge he has a severe mental health disorder, and inability to form normal relationships. For example, J.C.'s plan if released from the conservatorship was to move into a program run by the Jehovah's Witness church that trained church leaders. J.C. claimed to have read about the program but had not applied for the program. Further, J.C. did not formulate any other plans for shelter. When asked if he would take his medications after released, J.C. said that medications do not work and were a lie. Ultimately, Dr. Miller believed J.C. was gravely disabled by his severe mental health disorder.

Dr. Miller further believed J.C.'s grave disability meant he lacked the ability to enter contracts because his disorganized thoughts and delusions prevented him from understanding and remembering simple contracts. Dr. Miller also believed J.C. should not have the right to refuse or consent to routine medical treatment that was unrelated to his grave disability. He based that opinion on the fact J.C. held delusions about his medical condition and necessary medical treatments. In the past, J.C. complained about his heart beating abnormally and pushing out of his chest until he pushed it back to the proper position. J.C. complained about this problem and insisted on being transported to an emergency room or medical office, even though nobody else observed the problem. J.C. also complained of problems like muscle spasms and jaw issues that could be side effects of his medications; however, staff was never able to independently observe the symptoms. J.C. testified his medication made him clench his jaw, which causes his "left jaw to protrude out until it pulls a layer of skin down, and it fills with blood. And then it will pop, and then the blood will come out." J.C. claimed he saw a doctor about his jaw, and he was diagnosed with an abscess and prescribed antibiotics. Dr. Miller further pointed to J.C.'s poor judgment, disorganized thoughts, and delusions as justification to not entrust him with his own routine medical care.

In October 2024, the trial court found J.C. was gravely disabled and imposed several disabilities under Welfare and Institutions Code[1] section 5357, including that J.C. could not enter contracts or be responsible for his routine medical treatment. The court reappointed conservator nunc pro tunc from February 2024.

## II

### *Fee Order*

In August 2024, conservator filed a request for fees for the time between July 2017 through September 2018. The accounting for that year showed J.C. received $12,726.66 in government benefits and cash. The accounting showed $11,044.56 was paid from J.C.'s account for his living expenses and as cash to him. This left a balance of $1,682.10 in J.C.'s account after September 2018. The fee request totaled $8,082.50 for fees not accounted for in the accounting and to reimburse conservator, county counsel, and the public defender, who acted as J.C.'s attorney during that time. The petition for fees provided that, as of May 2024, J.C.'s estate consisted of $2,062.47 in cash assets and zero dollars in noncash assets. J.C.'s total liabilities were listed as being in the amount of $10,552.87 and included a prior fee order of $6,115.50.

To maintain J.C.'s eligibility for government benefits, conservator requested the trial court defer collection of the requested fees. Specifically, it requested authorization of payment from J.C.'s estate such that his estate retained a minimum value of $500 and did not go above a value of $2,000. In September 2024, the trial court approved conservator's request for fees, having heard no objection from J.C.

J.C. appeals.

---

[1]     Further undesignated section references are to the Welfare and Institutions Code.

4

## DISCUSSION

### I

*Legal Background*

"The [Lanterman-Petris-Short] Act authorizes short-term involuntary detentions (see . . . §§ 5150, 5250) and one-year conservatorships for those who are gravely disabled due to a mental health disorder or chronic alcoholism (see . . . § 5350)." (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095 (*Eric B.*).) In this context, " 'gravely disabled' " means "[a] condition in which a person, as a result of a mental health disorder, . . . is unable to provide for their basic personal needs for food, clothing, [or] shelter." (§ 5008, subd. (h)(1)(A); see *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54.)

"When a treatment professional determines a person is gravely disabled and unwilling or unable to accept treatment voluntarily, the county's public guardian may petition to establish a conservatorship." (*Eric B.*, *supra*, 12 Cal.5th at p. 1095, citing § 5352; see *Conservatorship of K.P.* (2021) 11 Cal.5th 695, 708-709.) "If the matter proceeds to trial and the person is found gravely disabled, the court appoints a conservator (. . . § 5350), imposes 'disabilities' as needed ( . . . § 5357), and determines an appropriate treatment placement ( . . . § 5358)." (*Eric B.*, at pp. 1095-1096, citing *K.P.*, at pp. 709-710.) "A conservatorship terminates after one year but may be extended for additional one-year terms upon petition." (*Eric B.*, at p. 1096, citing § 5361.)

### II

*Sufficient Evidence Supports The Trial Court's Imposed Disabilities*

Defendant does not challenge the finding he suffers from a grave disability. Instead, he contends insufficient evidence supports two of the trial court's imposed disabilities, namely the no contracting disability and the routine medical treatment disability. Conservator addresses the merits of J.C.'s contention and does not argue

mootness.  Accordingly, we will address the merits as well.  We conclude sufficient evidence supports the trial court's imposed disabilities.

A finding of grave disability alone is not sufficient to justify the imposition of the various special disabilities enumerated in section 5357.  (§ 5005; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312-1313 (*Riese*), superseded by statute on other grounds as stated in *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1103-1104.)  The conservatee retains the rights and privileges covered by the special disabilities unless the trial court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers corresponding authority on the conservator.  (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*); *Riese*, at p. 1313.)  Because the special disabilities deprive the conservatee of substantial constitutional rights, due process must be afforded before these rights are compromised.  (§§ 5357, 5358; *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612.)  " 'The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' "  (*George H.*, at p. 165.)  In other words, there must be evidence in the record to support each of the specific disabilities imposed.  (*Id.* at pp. 165-166.)

The trial court is not required to make a "specific, on-the-record statement of the reasons for each order" regarding a special disability.  (*George H.*, *supra*, 169 Cal.App.4th at p. 165.)  Nor does a petitioner for a conservatorship need to address each special disability by unique evidence directed at a particular disability.  (*Ibid.*)  We will affirm the trial court's imposition of special disabilities so long as substantial evidence supports each disability.  (*Ibid.*)

Under the substantial evidence standard, "[t]he testimony of one witness may be sufficient to support such a finding.  [Citation.]  We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses

6

substantial evidence.  Substantial evidence . . . is evidence that is reasonable, credible, and of solid value." (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.)  In reviewing the record for substantial evidence, we presume the existence of every fact the trier of fact could have reasonably deduced from the evidence.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  But we do not resolve conflicts in the evidence or reweigh the evidence, nor do we reevaluate the credibility of witnesses, as "those functions are reserved for the trier of fact." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1163.) "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.)

A

*Sufficient Evidence Supports The No Contracting Disability*

While J.C. characterizes his argument for striking the no contracting disability as a sufficient evidence argument, he concedes sufficient evidence supports an order prohibiting him from entering contracts in some form.  His argument, as refined in his reply brief, is that the trial court should have crafted the no contracting disability to permit for purchasing power under a certain threshold, such as $75, as many counties do. We conclude sufficient evidence supports the no contracting disability.

The standard to impose the no contracting disability is found in Civil Code section 1556, which prohibits persons of "unsound mind" from contracting.  Such incapacity has been categorized as follows:  (1) entirely without understanding (Civ. Code, § 38); (2) unsound but not entirely without understanding; and (3) susceptible to undue influence (Civ. Code, §§ 39, 1575).  (*Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835, disapproved on another ground in *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 485-486.)

Dr. Miller testified J.C. had disorganized thoughts, delusions, and hallucinations indicating to him that J.C. was incapable of comprehending and remembering terms in a contract.  This is evidence J.C. lacks understanding and is susceptible to undue influence,

7

which meets the threshold of sufficient evidence for imposing a no contract disability. (Cf. *George H.*, *supra*, 169 Cal.App.4th at p. 166 [evidence of mental health disorder, refusal to take medication, and that the appellant suffered delusional beliefs and auditory hallucinations supported the order suspending the appellant's right to contract].) Moreover, the evidence supports a conclusion J.C. is incapable of making sound small purchases, contrary to his appellate assertions. Between Dr. Miller's meetings with J.C., J.C. used methamphetamine, "a very cheap" drug that adversely affects J.C.'s mental health disorder. J.C.'s recent consumption of methamphetamine despite its adverse effect on him, demonstrates he may use his limited purchasing power to supply himself with methamphetamine and undermine his treatment. This provided sufficient evidence that J.C. was unsound in his small purchasing decisions, as well as larger contracting abilities.

B

*Sufficient Evidence Supports The Routine Medical Treatment Disability*

J.C. also contends substantial evidence does not support the conclusion he is incapable of making his own routine medical decisions because, while the evidence demonstrated he often imagined ailments, it did not reveal how he responded to actual medical conditions. We conclude sufficient evidence supports the court's imposed routine medical treatment disability.

*Riese*, *supra*, 209 Cal.App.3d 1303, identified the following factors to consider in determining whether a person is incapable of making treatment decisions: "(a) whether the patient is aware of his or her [or their medical] situation . . . ; (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese*, at pp. 1322-1323.)

8

Conservator urges us not to use this standard because the *Riese* court used it in the context of determining whether a patient could be subject to an involuntary medication order. But the underlying standard is the same whether the ultimate question is to involuntarily administer medication or remove a person's right to make routine health decisions. (See *Riese*, *supra*, 209 Cal.App.3d at pp. 1312-1313 [to impose disabilities, evidence must demonstrate the conservatee is incapacitated such that the imposed disability is appropriate].) Thus, we will follow the incapacity standard used in *Riese*.

In light of the *Riese* factors, the record supports a conclusion that J.C. was incompetent to refuse or consent to routine medical treatment unrelated to his grave disability. The record demonstrates J.C. often imagined muscle spasms, his heart popping out of his chest, and blood pouring out of his jaw. When these delusions occurred, he demanded medical attention even though no other person observed the complained of injuries. This evidence shows J.C. was unaware of and delusional about his medical situation, could not understand whether medical intervention was required, and was incapable of a rational thought process or evaluating information about his health. (See *Riese*, *supra*, 209 Cal.App.3d at pp. 1322-1323.)

J.C. further compares his facts to *Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 349-350, arguing his case is different because, unlike the conservatee in *Amanda B.*, he does not suffer from a serious medical condition unrelated to his mental health diagnosis and he has not refused routine medical treatment. We note the comparison to *Amanda B.* is of "limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Further, J.C.'s lack of a current medical condition and speculation he may respond rationally to an actual medical condition is of little consequence when the evidence demonstrates he is currently incapable of rationally assessing his health and need for medical attention. Accordingly, substantial evidence supports the trial court's imposition of the routine medical treatment disability.

9

*J.C. Has Not Demonstrated Error In The Trial Court's Imposition Of Fees*

J.C. argues the fee award for fees incurred between July 2017 and September 2018 was erroneously imposed for a variety of reasons. Acknowledging that his counsel never objected to their imposition, J.C. argues in the alternative that his counsel was ineffective. Conservator argues J.C.'s counsel was not ineffective and, consequently, J.C.'s contentions are forfeited. We agree with conservator that J.C. has not demonstrated his counsel was ineffective and thus many of his fee contentions are forfeited. To the extent J.C. asserts the fees were unauthorized as a matter of law, those claims lack merit.

Failure to raise an issue in the trial court normally results in the forfeiture of the issue on appeal (*People v. Boyce* (2014) 59 Cal.4th 672, 730-731), unless an appellant can demonstrate ineffective assistance of counsel (*People v. Espiritu* (2011) 199 Cal.App.4th 718, 725; see *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710 [conservatees have a right to effective assistance of counsel]). Ineffective assistance of counsel claims require a party to prove counsel's performance was deficient and that he or she or they was or were prejudiced by that deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) The reviewing court can begin with either element and does not need to address both if one is not met. (*Id*. at p. 697.) "To demonstrate deficient performance, [appellant] bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) "We presume 'counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and accord great deference to counsel's tactical decisions." (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) For prejudice, appellant must affirmatively "show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)

Here, there was a reasonable tactical explanation for counsel's failure to object to the imposed fees. Namely, to help J.C. maintain his eligibility for government benefits. To receive government benefits, J.C. needed to have less than $2,000 in assets, which he had exceeded at the time the fee petition was filed. Further, the trial court's fee order deferred payment of the fees until such time that money left after J.C.'s monthly expenditures was over $500, ensuring enough money to pay for J.C.'s care and living expenses. Conservator was also prohibited from taking funds from J.C. that would leave him with less than $500 in his account. Given the conditions placed on conservator's collection of fees and J.C.'s need to maintain government benefits, it is reasonable J.C.'s counsel believed the fee order would benefit him by maintaining his eligibility while also providing enough funds for his care.

J.C. disagrees in light of his over $10,000 of liabilities calculated at the end of the fee period, which he argues were sufficient to maintain his eligibility for government assistance. While this may be a significant amount of debt, it is reasonable J.C.'s counsel believed the conservator needed a way to assist J.C. in maintaining his government benefits that paid for his care for a prolonged period of time. Indeed, without government benefits, J.C's debts would only increase with the costs owed to the residential care facilities housing him. Further, given the imposed conditions for deferred payment, it is reasonable counsel believed J.C. had the ability to pay the deferred fees contained in the fee order. Because we cannot say there could be no satisfactory explanation for counsel's failure to object to the imposition of these fees (see *People v. Mai* (2013) 57 Cal.4th 986, 1009), we cannot conclude counsel's performance was deficient (see *Strickland v. Washington*, *supra*, 466 U.S. at pp. 691-692).

Thus, while many of J.C.'s claims are forfeited because of his counsel's failure to object, this is not true for his contentions involving an unauthorized fee. (See *In re G.C.*

11

(2020) 8 Cal.5th 1119, 1130 ["an unauthorized sentence or one in excess of jurisdiction is a sentence that 'could not lawfully be imposed under any circumstance in the particular case' "].) He raises two contentions in this regard: (1) The trial court was unauthorized to impose fees to compensate J.C.'s public defender; and (2) the court was unauthorized to impose fees without first considering J.C.'s ability to pay.

As to J.C.'s first contention, Probate Code section 1471 authorizes the trial court to appoint an attorney to represent a conservatee in conservatorship proceedings. Probate Code section 1472, subdivision (a) authorizes the court to impose "a reasonable sum for compensation and expenses" for the conservatee's appointed attorney subject to the conservatee's ability to pay. Thus, the court's imposition of fees for J.C.'s public defender was authorized by statute. Further, the fee order was imposed "on conclusion of the matter," as required by Probate Code section 1472, subdivision (a), because the fees were imposed after the conservatorship over J.C.'s estate was terminated, and the prior conservator was removed and J.C.'s mother undertook the care of his person.

As to J.C.'s second contention that the fee order is unauthorized because the trial court did not inquire as to J.C.'s ability to pay, we also conclude that argument lacks merit. The court provided in the fee order that it found the compensation requested was just and reasonable and, in so doing, it considered whether the compensation requested would impose an economic hardship on J.C. While J.C. argues this was an adoption of the standard provided by conservator and does not represent the court's independent assessment, we must reject this contention. We presume the trial court followed the law and all applicable standards absent a showing to the contrary. (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499.) Here, the court indicated it considered J.C.'s financial situation before imposing fees. The application included 20 pages of printouts accounting for J.C.'s financial situation, noting his income, expenses, and liabilities. The record does not support an inference that the court ignored J.C.'s financial situation when imposing the fee order. Accordingly, J.C. has not shown the fee order was unauthorized.

DISPOSITION

The orders are affirmed.

/s/_____
ROBIE, J.

We concur:

/s/_____
EARL, P. J.

/s/_____
WISEMAN, J.*

_____

*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.